## IN RE THERESA S. ET AL.*
## (11739)

PETERS, C. J., HEALEY, PARSKEY, SHEA and SANTANIELLO, Js.

Argued November 16, 1984—decision released April 23, 1985

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed and the records and briefs will not be distributed to the various libraries of the state. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Supreme Court.

*Jackie Chan,* for the appellant (mother).

*Judith M. Earl,* assistant attorney general, with whom, on the brief, was *Joseph I. Lieberman,* attorney general, for the appellee (commissioner of children and youth services).

*John M. Wabiszczewicz,* for the minor children.

SANTANIELLO, J. The respondent mother's parental rights were terminated in proceedings before the trial court following a finding of neglect by a state trial referee. On appeal the respondent claims that the trial court erred (1) in applying an incorrect standard of proof to the parental termination proceeding, (2) in finding adequate evidence on which to base termination, and (3) in applying an improper "best interest" standard to the termination proceeding. The briefs of the attorney general for the commissioner of children and youth services and of the minor children raise the additional question of whether the purpose of parental rights termination under General Statutes §§ 17-32d (e) and 45-61b (g) is to free a child for adoption.[1]

The trial referee found the following facts, which were also adopted by the trial court. On November 12, 1980, the respondent attempted to take her own life and the lives of her two minor children, who were then approximately two years old and four months old, by

---

[1] General Statutes § 17-32d (e) provides in part: " 'Termination of parental rights' means the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except it shall not affect the right of inheritance of such child or the religious affiliation of such child."

General Statutes § 45-61b (g) provides in part: " 'Termination of parental rights' means the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except it shall not affect the right of inheritance of the child or the religious affiliation of the child."

cutting their wrists and her own with a kitchen knife. Each of the children suffered a severed artery as a result of this assault and was in critical condition from loss of blood, but, as a result of effective medical intervention at the hospital, each child was out of physical danger within forty-eight hours. Further surgery was required for the younger child approximately a month later to help her regain full use of her fingers. The respondent's self-inflicted injuries, unlike the injuries of her children, were not life threatening. It was determined after a psychiatric examination that her actions were the product of a psychotic episode wherein she "underwent the delusioned belief that it was necessary to kill herself and the children to protect them all from the devil who was seeking to possess them, and from the catastrophes that were about to beset the world." Because of her disturbed mental condition, upon discharge from the hospital on November 14, 1980, she was admitted to a mental institution where she remained for approximately five weeks.

The relationship of the respondent and her husband, before the events of November 12, 1980, can be characterized as unstable. The parties' marriage in 1972 was followed by the death of their first-born child. The couple separated for a year, then divorced, during which time for several months the respondent became involved with her husband's brother and underwent psychiatric treatment following an alleged suicide attempt. She thereafter remarried her husband and gave birth to two children. Following her second suicide attempt shortly after the birth of her youngest child, she became for a period of some four months the patient of a psychiatrist who treated her for a "thought disorder with anti-psychotic medication but did not feel she was motivated for treatment."

On the evening prior to the attack on the children, the respondent's husband returned home from his

employment and discovered the children unfed and his wife lying on the bathroom floor with a large kitchen knife close at hand. She told him that she wanted to do away with herself and that the television set had been talking to her. In response to this behavior, the husband stayed home from his employment on the following day and went with his wife to his mother's home where she told her mother-in-law that she was God's daughter and her husband was Jesus Christ. During the day the respondent was taken to a church pastor who counseled both parties for approximately ninety minutes.

Notwithstanding the unsettling events of November 11 and November 12, and with the knowledge that the respondent had on two previous occasions attempted to take her own life, the husband left his wife and children at about 6:30 p.m. on November 12 to participate in his regular Wednesday night bowling game in Brookfield. It was upon his return, approximately three hours later, that he found the children bleeding in their cribs and his wife standing at the head of the stairs holding a bloody knife that she urged him to use upon himself.

On November 13, 1980, the respondent was arrested pursuant to a warrant on two counts of assault in the first degree in violation of General Statutes (Rev. to 1979) § 53a-59.[2] On December 19, the department of

---

[2] "[General Statutes (Rev. to 1979)] Sec. 53a-59. ASSAULT IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person; or (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person.

"(b) Assault in the first degree is a class B felony."

children and youth services (DCYS) brought coterminus petitions against both parents for neglect and termination of parental rights. Pending a judgment on the merits of the petitions, the children were placed in the temporary care and custody of DCYS. During this interval, the respondent was allowed to visit the children on a supervised basis. She also received substantial medical attention, and psychiatrists agreed that at the time of the assaults and attempted suicide she had suffered an "insane delusion." The physicians further agreed that the respondent is a schizophrenic with a history of acute depression.

On diverse days between August 24 and October 21, 1981, trial was held on the petitions for neglect and termination of parental rights before *Hon. Thomas D. Gill*, state trial referee. The referee filed reports on November 11 and November 12, 1981, recommending that both parents be adjudicated neglectful, but that only the respondent's parental rights be terminated.

Following this recommendation, the trial court, *DeMayo, J.*, reviewed the reports of the referee, conducted an informal conference,[3] heard final arguments from all counsel and visited with the two minor children. On April 27, 1982, the court accepted the recommendation of the referee as to the respondent and rendered a judgment terminating her parental rights. Although the children's father was found guilty of neglect, the trial court specifically did not find sufficient evidence to terminate his parental rights. The respondent then brought the present appeal. On July 11, 1984, this court granted the attorney for the children permission to file a brief in the case.

The respondent's first claim of error is that the trial court did not follow the statutorily mandated criterion

---

[3] "After an informal conference, the Motion to Correct of the Respondent . . . was withdrawn and final arguments were heard on January 21, 1982."

of "clear and convincing evidence," General Statutes § 17-43a,[4] but instead incorrectly applied a "strong evidence" standard in terminating her parental rights. The respondent contends that because the trial court used the phrase "strong evidence" in its memorandum of decision, and did not specifically state that its conclusions were based on "clear and convincing evidence," it in fact applied the wrong standard to the termination proceedings.

---

[4] General Statutes (Rev. to 1983) § 17-43a provides in pertinent part: "TERMINATION OF PARENTAL RIGHTS OF CHILD COMMITTED TO COMMISSIONER. (a) In respect to any child committed to the commissioner of children and youth services in accordance with section 46b-129, either the commissioner, or the attorney who represented such child in the prior commitment proceeding, or an attorney appointed by the superior court on its own motion, or an attorney retained by such child after attaining the age of fourteen may petition the court for the termination of parental rights with reference to such child, including the right to petition the court for the revocation of the commitment of the child. The superior court upon hearing and notice, as provided in sections 45-61d and 45-61f, may grant such petition if it finds, upon clear and convincing evidence, that over an extended period of time, which, except as hereinafter provided in this subsection, shall not be less than one year: (1) The parents have abandoned the child in the sense that they have failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare; or (2) the parents have failed to achieve any such degree of personal rehabilitation as would reasonably encourage the belief that at some future date they could assume a responsible position in their child's life; or (3) the parents, by reason of continuing physical or mental deficiency have, and for such period of time as will be detrimental to the best interest of the child, will be unable to provide him with the care, guidance and control necessary to his physical, educational, moral and emotional well-being; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; or (5) that both parents, or the sole parent of such child have consented to termination of parental rights with respect to such child. The court may waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child."

The petitions of neglect and to terminate parental rights were referred to the trial referee for a complete evidentiary hearing by agreement of all parties. The referee conducted substantial inquiry into the facts surrounding the case and made conclusions therefrom in his report to the court. His findings were clear, extensive, complete, and unequivocal. He specifically based his conclusions that the respondent should not be permitted to exercise any further parental rights, on "evidence so definitive as to meet the higher standard of proof applicable to termination actions, that of clear and convincing evidence . . . ."[5] The parties did not pursue their right to correct these findings under Practice Book § 438.[6] The only motion to correct was filed by the respondent and was withdrawn prior to the conclusion of the hearing before the court. The trial referee filed his report with the court, which did not take any additional evidence but accepted the referee's evidentiary findings and conclusions.[7]

---

[5] In *Santosky* v. *Kramer,* 455 U.S. 745, 747–48, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982), the United States Supreme Court held that due process requires that the state support its decision to terminate parental rights by "at least clear and convincing evidence."

[6] "[Practice Book] Sec. 438. MOTION TO CORRECT

"If either party desires to have the report or the finding corrected by striking out any of the facts found, or by adding further facts, or by stating the claims of the parties made before the committee, or by setting forth rulings upon evidence or other rulings of the committee, he shall within two weeks after the filing of the report or finding file with the court a motion to correct setting forth the changes and additions desired by him. He shall accompany the motion with a brief statement of the grounds of each correction asked, with suitable references to the testimony. The file shall then be returned to the committee for consideration of the motion to correct. As soon as practicable the committee shall file with the court the motion to correct, together with his decision thereon."

[7] Practice Book § 443 provides as follows: "The court shall render such judgment as the law requires upon the facts in the report as it may be corrected. If the court finds that the committee has materially erred in his rulings or that by reason of material corrections in his findings the basis of the report is subverted or that there are other sufficient reasons why the report should not be accepted, the court shall reject the report and refer

The respondent claims that because the court used the phrase "strong evidence" in its decree it, in effect, did not apply the mandated standard of "clear and convincing evidence." We find that the court's use of the expression "strong evidence" was merely a fortuitous choice of words directed at only one segment of the many factors considered in a termination proceeding, namely, that the "children can never really be safe alone with their mother . . . . " The trial court, by accepting the report of the trial referee in toto, applied the statutorily mandated criterion of "clear and convincing" to its evidentiary findings as to all factors applicable to termination proceedings.

The second claim of the respondent is that the trial court erred in finding sufficient evidence upon which to base termination. General Statutes (Rev. to 1983) § 45-61f (d)[8] requires two adjudicatory conclusions before a petition for termination of parental rights should be granted: It must be shown first that, as a result of acts of parental commission or omission, the child has suffered neglect; and, second, that the nature

the matter to the same or another committee for a new trial or revoke the reference and leave the case to be disposed of in court.

"The court may correct a report at any time before judgment upon the written stipulation of the parties or it may upon its own motion add a fact which is admitted or undisputed or strike out a fact improperly found."

This section gives the trial court the opportunity to correct or reject the trial referee's report. If no action on the report is taken the court must accept it in full.

[8] General Statutes (Rev. to 1983) § 45-61f (d) provides in pertinent part: "[T]he court may approve the petition terminating the parental rights . . . if it finds, upon clear and convincing evidence . . . (2) that the child has been denied, by reason of acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being whether such denial is the result of the physical or mental incapability of the parent or conditions attributable to parental habits, misconduct or neglect, and these parental acts or deficiencies support the conclusion that the parent cannot exercise, or should not, in the best interests of the child, be permitted to exercise, parental rights and duties . . . . "

.

of the parental acts or deficiencies is such as to support the conclusion that, "the parent cannot exercise or should not, in the best interests of the child, be permitted to exercise, parental rights and duties."

The referee's report to the trial court included the following findings. The respondent's unwarranted and life threatening attacks on her children were caused by a psychotic episode where she believed that by killing the children she was protecting them from fantasized evils; that the respondent had made several prior attempts on her own life; that the children's sense of trust in their mother was seriously damaged by her physical assault on them; that her actions prior to these incidents were unstable and unpredictable; that as a result of hospitalization following the events of November 12, 1980, the respondent received substantial therapeutic treatment and supportive services as well as diagnostic evaluations; that two psychiatrists concurred in ascribing her illness to a biological vulnerability to depression that has been exacerbated by her life experiences; that both psychiatrists agreed that the duration of the mother's mental illness is to be equated with her lifetime, and that without appropriate medication supplemented by professional counseling, there is a substantial risk of further psychotic episodes; that there were significant questions as to whether the respondent was ready to assume a maternal role when the children returned home, and, whether she was willing to persist indefinitely in the intensive medication and counseling program held essential to her mental well-being; that absent such supervision, and the maintenance of a therapy program, the children would be at the risk of physical mistreatment while in the care of their mother; that the older child had "evidenced her recollection of what befell her both by displaying her scarred wrists to visitors and by saying to her mother on at least four or five of her parents' visits with her,

'Mommy you cut me' ''; that this child also had night-mares and attacks of vomiting following family visits to the degree that it was recommended she be given clinical help; that the treating psychiatrist felt that there was a loss of trust in the mother and, conse-quently, emotional injury to the children; and that this loss of trust was an insurmountable obstacle in the re-establishment by the mother of the kind of full and wholesome mother-child relationship essential to the children's emotional health.

The referee concluded that any situation which per-mits the respondent to play an active parenting role in the lives of her children posed an immediate threat to their physical integrity. In addition to the existing threat of danger, the attending psychiatrist testified that because of hazards that would be placed in the paths of the children's emotional development, a re-entry by the respondent into their lives would not be in their best interests. The trial court adopted the find-ings of the trial referee and concluded that the mother should not be permitted to exercise parental rights and duties.

" '[W]e are not in a position to second-guess the opin-ions of witnesses, professional or otherwise, nor the observations and conclusions of the [Superior Court for Juvenile Matters] when they are based on reliable evi-dence.' " *In re Juvenile Appeal (83–BC)*, 189 Conn. 66, 77, 454 A.2d 1262 (1983). The evidence upon which the trial court based termination was substantial and con-vincing, and the court thoroughly considered the large degree to which the respondent's actions adversely affected the physical, emotional, and psychological well-being of the children. We find the evidence in this case overwhelmingly supports the trial court's decision to terminate the respondent's parental rights.

The respondent raises the additional claim that because the state's psychiatrist did not phrase his answers to the respondent's questions in terms of reasonable medical probabilities, his testimony should not have been accorded the weight of expert testimony in determining the best interests of the children. The respondent cites *Healy* v. *White,* 173 Conn. 438, 443, 378 A.2d 540 (1977), wherein we stated that "[a]n expert witness is competent to express an opinion, even though he or she may be unwilling to state a conclusion with absolute certainty, so long as the expert's opinion, if not stated in terms of the certain, is at least stated in terms of the probable, and not merely the possible." The respondent argues that the testifying psychiatrist used the words "probably" and "possibly" interchangeably, and that his conclusions were therefore not "founded firmly on medical knowledge, as was obviously contemplated by *Healy* . . . . " Our review of the transcript does not support the respondent's contention. Initially we note that, in his testimony, the psychiatrist rarely used the words "probably" or "possibly" in response to questions by either party's counsel. The majority of his answers began with the phrase "I think . . ." followed by a statement of his opinion as to the subject asked. The respondent never attempted to clarify the doctor's answers by asking whether his opinion was based upon medical possibilities or probabilities by asking him to rephrase his answer in terms of probability percentages, or inquiring whether a certain result was more likely than not. Under these circumstances, we cannot conclude that this psychiatrist's opinions and conclusions were of mere medical possibilities only. We therefore find this testimony was properly accorded the weight of expert testimony in determining that the respondent's parental rights should be terminated.

The third claim submitted by the respondent is that the trial court erred in concluding that the best interests of the children would be served by terminating the respondent's parental rights.

General Statutes (Rev. to 1983) § 17-43a allows for the termination of parental rights for any child committed to the custody of the commissioner. It provides in part: "The superior court upon hearing and notice . . . may grant such petition if it finds, upon clear and convincing evidence, that . . . (3) the parents, by reason of continuing physical or mental deficiency have, and for such period of time as will be detrimental to the best interest of the child, will be unable to provide him with the care, guidance and control necessary to his physical, educational, moral and emotional well-being . . . ."

We have already stated in our discussion of the respondent's first claim of error that the trial court adopted the trial referee's findings and recommendations, which were based upon the statutorily mandated standard of "clear and convincing evidence." A combination of factors led us to conclude that there was overwhelming evidence to support the trial court's decision to terminate the respondent's parental rights. In considering the present claim of error we again note the several psychotic episodes resulting in the respondent's suicide attempts; the traumatic attack on the minor children; the lack of stability of the respondent; her need for ongoing medical and psychological supervision; the damage inflicted on the minor children, which seriously affected their sense of trust in the respondent; the findings by both psychiatrists that her mental illness was to be equated with her lifetime; the continued recollection by the older child of her horrifying experiences, which constitute an insurmountable obstacle to the reestablishment of a full and wholesome mother-child relationship essential to the children's

emotional health; and the conclusion that, absent appropriate continuing supervision and the maintenance of a therapeutic program, the children would be at risk of physical mistreatment while in the care of the respondent and could never really be safe alone with her. We find that these factors, taken as a whole, are more than sufficient to support the court's conclusion that termination of the respondent's parental rights will serve the best interests of the children.

The respondent argues that the trial court could not logically have concluded that termination was in the best interests of the minor children, without also ordering that the children be put up for adoption. Since no adoption order was entered, the respondent contends it makes no sense to sever permanently the ties between the respondent and her children.

The DCYS, which at trial advocated termination of the respondent's parental rights, here takes the unusual posture of supporting the respondent's position. Its argument is based on an interpretation of General Statutes §§ 17-32d (e) and 45-61b (g), which define termination of parental rights as, "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption . . . ."

This court agrees that the termination of parental rights is part of the adoption process; it is clear that adoption cannot proceed unless the parents' rights are terminated in the first instance. The converse is not true. The parents' rights can be terminated without an ensuing adoption. When both parents' rights are terminated, it becomes the obligation of the state to look for permanent placement for the child or children. Adoption is the most appropriate solution unless family members such as grandparents, aunts, uncles, brothers,

sisters, etc., are available to act as surrogates on either a temporary or permanent basis. Although petitions for termination are presumably seldom brought unless prospective adoptive parents are available; *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 673, 420 A.2d 875 (1979); it is clear that there are circumstances wherein termination of a parent's rights is not followed by adoption.

Section 45-61f (e) of the General Statutes, as amended, reads: "If the parental rights of only one parent are being terminated, the remaining parent shall be the sole parent and natural guardian." This section clearly indicates that there is an alternate course to the termination of parental rights followed by adoption. In the present case, termination of the mother's parental rights will not cause the children to be set adrift as permanent wards of the state, since the natural father's parental rights have not been terminated and he is available to raise the children.

The fact that the children now live in a single parent household is in no way dispositive of the issues presented in this case. In today's society, there are increasingly large numbers of single parent homes with varying degrees of success. It is better to have a single parent home based upon love, care and attention than to have the two parent home that existed in these circumstances. The welfare of the child is the most important factor to be considered, and each set of individual circumstances will dictate the end result. In this case, the trial court's decision not to terminate the father's parental rights eliminated consideration of the adoption process.

There is no error.

In this opinion the other judges concurred.