[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for the termination of parental rights of Vanessa B. and Juan G. They are the parents of the minor child Caresse B. who was born on March 30, 1989. She is at the present time almost eight years of age. The petitioner has alleged that the parents have abandoned the child within the contemplation of General Statutes § 17a-112; that both parents have failed to rehabilitate themselves; that both parents have committed acts of omission or commission which have denied the child the care, guidance and control necessary for Caresse's physical, educational or emotional well being and that there is no ongoing parent child relationship as that term is defined by law. In the memorandum submitted by the petitioner, post trial, the petitioner has withdrawn the ground alleging acts of omission or commission.
In this case the mother Vanessa B. was personally served with CT Page 2717 process and was in court represented by an attorney with a court appointed guardian ad litem. The father Juan G. has not participated in any of the proceedings regarding Caresse which go back to July of 1990. The court confirmed notice to the father by publication (Sequino, J.). This court finds that the appointment of an attorney for a non-appearing, non-contributing parent of unknown address would serve no useful purpose.
The trial of this case occurred over four days during which time twenty-six exhibits were offered into evidence and the court heard from three case workers from the Department of Children and Families (DCF), Dr. David Mantel and Dr. Ruth Grant, licensed psychologists who have evaluated the mother and the child. The respondent mother testified in her own behalf and further called a DCF case worker as her only other witness. Juan G. failed to appear for trial and was defaulted by the court for his failure to appear.
The court finds the following facts by clear and convincing evidence: Vanessa B., the child's biological mother, was born on January 19, 1962 in Brooklyn, New York. She was abandoned by her biological family and was committed to the State and placed in a foster home in Trenton, New Jersey. Vanessa gave birth to her first child at the age of thirteen and that child was placed in adoption immediately after birth. A second child was born to Vanessa when she was fourteen years of age. The New Jersey Child Protection Agency became involved with that child one month after the child was born. The child was subsequently placed in the care of her paternal aunt. Caresse B., the child presently involved in this petition, was Vanessa's third child born on March 13, 1989. Vanessa gave birth to another child on December 12, 1991 and that child lives with a paternal aunt who has guardianship of the child. Each of the children have different paternities. None of the children reside with the mother. Vanessa reports to being an epileptic afflicted with grand mal seizures which she reports to having been caused by her first husband hitting her on the head with a lead pipe. Vanessa has been hospitalized on numerous occasions due to her inability to appropriately medicate herself. She reports also to having made two to three suicidal attempts by ingesting cocaine and by cutting her wrist.
The case of Caresse came first to the attention of DCF just prior to July 13, 1990 when the Superior Court for Juvenile Matters issued an order of temporary custody for Caresse. It was alleged that on two occasions fires broke out in the mother's CT Page 2718 apartment while she was passed out from an overdose of her medication and the child was unsupervised. Caresse spent three months in relative foster care before being returned to her mother under an order of protective supervision. DCF, then known as the Department of Children and Youth Services, prepared court ordered expectations for the mother which included her obligation to obtain monthly monitoring of her blood level by Dr. Wong at the Hill Health Center and to co-operate with homemaker services to assist Vanessa in caring for Caresse. In January of 1992 DCF closed its file on Vanessa.
The child next came to the attention of DCF on July 23, 1992 after the child was admitted to St. Raphael's Hospital with a spiral fracture of the humerus. The hospital evaluation also indicated that the child had sustained other injuries, was under weight, under height and delayed in speech. A petition was filed with the Juvenile Court indicating that the mother had failed to provide proper medical attention in a timely fashion for Caresse. The order of temporary custody was signed on July 27, 1992. Caresse has been out of the home and in foster placement since that date. An adjudication of neglect was made on September 2, 1992 and the child was committed to the care and custody of DCF. Extensions were granted on February 22, 1994, August 31, 1995 and April 10, 1996. Her present commitment expires April 10, 1997.
As part of the expectations set by the court at the time of commitment the mother was to attend Clifford Beers for parenting classes; a parents' group session at the Coordinating Counsel for Children in Crisis; and the Connecticut Mental Health Clinic for evaluation and individual counseling. The records reflect that the mother attended only one meeting at the Clifford Beers. She failed to attend any session at the Coordinating Counsel for Children in Crisis and missed all scheduled appointments at the Connecticut Mental Health Clinic. During the nearly five years of commitment the mother has professed interest in visiting with her child, however she has failed to do so consistently and all objective observers have noted that there is no on-going parent child relationship between Vanessa and the child.
As recently as January 28, 1996 the mother attempted suicide by ingesting pills. She also recently intentionally inflicted wounds upon herself. She is presently incarcerated and when asked in court why she is in prison she said, "I'm here for violence". Mr. R., an elderly gentlemen with whom Vanessa lived, went to the court and told the judge, "I had a knife to cut his throat, but I CT Page 2719 didn't do nothing to him, but I cut my leg open because he told a fib and I was very upset."
Vanessa was evaluated at the direction of the court by Dr. David M. Mantell, a clinical psychologist. Dr. Mantell reports as follows:
 The mother entered in a self preoccupied and agitated fashion, speaking to herself and rambling. She appeared disoriented to subject but slowly calmed. She is a thirty-four year old women who reports an eleventh grade education and four out of wedlock children each with a different paternity. The mother has care and custody of none of her children. A fifth child from a fifth paternity developed in her fallopian tube. The mother reports that maybe two of her pregnancies were planned. She describes a series of troubled relationships with different men, explaining that her stepbrother was the father of her first child. She said she is disabled from epileptic seizures, grand mal, since the age of sixteen as her husband hit her over the head with an iron pipe because she said she was leaving him.
Vanessa told Dr. Mantell that she had been raped twice in New Haven, that she did not wish to be with any man, she had quit her job and that the father of her second child is a deaf mute, who cannot hear or talk, but gets mad a lot and is now is jail in Trenton. In summary, Dr. Mantel concluded as follows:
 The mother is a chronically, psychologically disordered, mildly, mentally retarded, epileptic women with a history of multi-pregnancies, parental failure, severe dependence, battering and child neglect. She is quite limited intellectually and emotionally and presents in a childlike manner. Judgment is poor. Rehabilitative potential is considered minimal to non-existent.
Dr. Ruth Grant testified that there is no parental bond to break in this case since none exists. Her observations were made on October 23, 1995. She observed the child interact with the mother. The following is noted from Dr. Grant's report.
 Caresse responded by beginning to play out of sight under the conference table, but Vanessa thought that Caresse would bite her and got angry. Said that CT Page 2720 she was "thinking about not taking her back home because she was getting too bad". Caresse tried to get her attention after she said that she would not take her back. The examiner had to terminate the interaction after Vanessa lost patience with the child, grabbed her hard by the shoulder and struck her hand, verbally rebuking her. She had become very angry with her for saying, "liar". After the interaction she indicated that she might think about the adoption. Caresse was removed from the room and placed with a sheriff until the social worker returned.
Dr. Grant concluded that the analysis of the projective testing done on Vanessa indicates that an impoverished background, intellectual challenges, neglect and abuse have rendered her unable to care for herself and others. Her impulse control is poor and her mannerisms are regressed. She is quick to anger, defensive, and shows extreme emotional limitations. She can be pleasant with authority figures but is demanding of those around her. Dr. Grant recommended that if Vanessa were to have any visitation at all it would have to be supervised and Vanessa should be fully instructed that physically abusing a child under her care is unacceptable behavior. In her testimony in court Dr. Grant indicated that Vanessa does not have the skills nor could she acquire the skills necessary to parent a child. Dr. Grant further indicated that she knew of no programs available through the Department of Mental Retardation that could effectively provide the necessary services for Vanessa to parent a child. With respect to the interaction between Vanessa and Caresse, Dr. Grant described the interaction as not that of a parent to a child but rather as more like two children interacting "but one of them was much bigger and stronger". Dr. Grant further indicated that while she knew of no programs available for mentally retarded parents to assist them in parenting, even if there were such a program it would not be particularly helpful with mentally retarded persons who are hostile, quick to anger and aggressive as is Vanessa. During the testimony of Vanessa she indicated she knew that the Department of Mental Retardation (DMR) is "for crazy people" and very definitely stated to her own attorney "I don't want them to send me there!". Under redirect examination by her guardian ad litem, Vanessa indicated her willingness to co-operate with the DMR in the event DCF sends her there.
Vanessa's lack of co-operation with DCF is well documented CT Page 2721 however. The social studies submitted by DCF for termination of parental rights was admitted as Exhibit 3A. On page 10 of that social study the case worker indicates the degree of compliance by Vanessa with the expectations of the court. Vanessa has not complied with the expectation to keep DCF aware of her whereabouts. Vanessa has missed 17 scheduled appointments with DCF. The visits with the child have been irregular and inconsistent. With respect to services offered Vanessa, including individual counseling and parenting classes, Vanessa has failed to co-operate. As earlier indicated, she did not complete the Clifford Beers parenting classes; she went to only one meeting. She went to none of the appointments for the Coordinating Counsel for Children in Crisis which is a parent group counseling program. DCF scheduled appointments at the Connecticut Mental Health Clinic for evaluation and individual counseling. Vanessa did not attend any of those scheduled appointments. Vanessa has failed to secure and maintain adequate housing for the care of herself and her child. After nearly five years of foster care Vanessa offers no plan for reunification with her daughter.
A further expectation was that Vanessa would avoid any involvement with the criminal justice system. Vanessa did not comply with this expectation as she is presently incarcerated. The child has been in foster care for nearly five years and Vanessa is no closer to rehabilitating herself to be able to parent this child than she was when the adjudication of neglect was made in 1992.
The respondent mother claims that DCF violated the Americans with Disabilities Act, 42 United States Code § 12132. Specifically, she claims that DCF is a "public entity as that term is defined in the Act, and that the respondent mother is a "qualified individual with a disability" by virtue of her seizure disorder and possible mental retardation.
The respondent argues that the intent of Congress is to help "individuals with a disability who with or without reasonable modification to rules, policies, or practices meets the essential eligibility requirements for receipt of services or their participation in programs or activities provided by a public entity."
If DCF had failed to provide or offer reasonable services to the respondent the allegation of violation of the Americans with Disabilities Act (ADA) might have some application. That, CT Page 2722 however, is not the case. The respondent, Vanessa, has been treating medically with physicians since she was sixteen years of age and has medication for treatment of her epilepsy. There is no claim advanced that Vanessa was denied medical treatment. With respect to her psychological or emotional needs the department consistently tried to enroll Vanessa at the New Haven Family Alliance, the Connecticut Mental Health Center for assessment and therapy and the Coordinating Counsel for Children in Crisis for parents group therapy. Vanessa has consistently resisted repeated offers for counseling.
Under regulations promulgated under the ADA, 28 C.F.R. § 35.130
(e)(1), the regulations state as follows:
 Nothing in this part will be construed to require an individual with a disability to accept an accommodation aid, service, opportunity or benefit provided under the ADA or this part which such individual chooses not to accept.
The department social workers cannot compel an adult to attend counseling or to benefit from services. The parent must be motivated to seek and benefit from treatment and Vanessa was not sufficiently motivated to keep her scheduled appointments.
The mother's ADA argument implicitly suggests that reasonable services were available to accommodate Vanessa's disabilities. The court finds that there was no offer of proof that such services are available. Indeed, the services required to provide twenty-four hour support to Vanessa would have to be of such magnitude as to constitute surrogate parenting. Vanessa is emotionally and intellectually little more than a child herself. She is unable to provide spiritual and intellectual guidance and the consistent round the clock physical care required of a minor child. She is frequently incapacitated by illness. She is quick to anger and hostile. She is presently incarcerated in jail. She has had multiple dysfunctional relationships and according to Dr. Mantel, functions as a seven or eight year old. In short, the court finds by clear and convincing evidence that mother has no parenting ability whatsoever and that no reasonable accommodation can be made by DCF or DMR to enable her to effectively parent this minor child.
ADJUDICATION
The court finds by clear and convincing evidence that Caresse CT Page 2723 B. was adjudicated as a neglected child being denied proper care and attention as well as being permitted to live under conditions, circumstances or associations injurious to her well being and was committed to the care and custody of the Commissioner on September 2, 1992. The court further finds by clear and convincing evidence that the respondent parents have failed to achieve a degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child that they could assume a reasonable position in the life of the child within reasonably foreseeable time. General Statutes § 17a-112 (b)(2).
As to the father Juan G., the court further finds that in violation of General Statutes § 17a-112 (b)(1) that the father has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child and as such he has abandoned this minor child.
The court finds that these grounds have existed for more than one year.
DISPOSITION
Having determined that statutory grounds exist to terminate the rights of Vanessa B. and Juan G. the court must consider whether it is in the child's best interest to enter an order of termination based upon facts existing as of the date of trial. InRe: Romance M., 229 Conn. 345, 356-57 (1994). The court is further mandated to consider and make written findings regarding the seven findings set forth in General Statutes § 17a-112
(d).
(1) The timeliness, nature and extent of services offered or provided to parent and the child by the agency to facilitate the union of the child with the parent. The court finds that DCF offered offered visitation services to the respondent mother which included bus passes, physical transportation of the child to the mother and the mother to the child. The agency provided foster care for the child during a period of time it was hoped the mother would be able to rehabilitate herself. DCF offered the various services as previously set forth to the mother which she did not attend. The department offered no services to Juan G. as he has not presented himself to the court as an interested party.
(2) Whether DCF has made reasonable efforts to reunify the CT Page 2724 family pursuant to Federal Child Welfare Act of 1980 as amended. The court finds by clear and convincing evidence that DCF has made reasonable efforts to reunify the child with the mother. Indeed, in 1990 the child was removed from the home and subsequently returned to Vanessa's care. Services were offered and protective supervision was provided. This demonstrates the good-faith of DCF in working toward reunification. In 1992 the child was removed again from the family home. Services were offered and the mother has failed to participate in the services. The agency cannot compel the mother to benefit from the services. With respect to the respondent father, this parent has been unable or unwilling to participate in reunification efforts and as such DCF was unable to provide services to him.
(3) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent and the extent which all parties have fulfilled their obligations under such order. The department with the approval of the court set reasonable and realistic expectations in order to reunify the mother and the child. There was only minimal compliance by the mother. There was no compliance or participation by the father.
(4) The feelings and emotional ties of the child with respect to his parents and any guardian of his person and any person who has exercised physical care, custody or control of the child for at not relate to her mother as a parent. They relate to each other as one child to another. While Dr. David Mantell observed that there was a good deal of affection expressed between mother and child he further noted that "the mother seems dependent upon the child's affection and does not understand the requirements of the adult role. Because of her own neediness the mother cannot empathize with the child. I do not think the mother can set expectations for the child's age and ability and mother and child contact probably has a disabling impact on the child." The child has no known memories of the male biological parent. The child does have a strong emotional tie with the foster mother. Dr. Mantell observed that he found the child and foster mother mutually very comfortable.
(5) The age of the child. The court finds that Caresse will be eight years old within the month. She has been in foster care for five years. The child requires stability in placement and continuity of care that should not wait. The child's attorney recommends termination of parental rights to allow for permanent placement of the child. CT Page 2725
(6) The efforts the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return him to his home in the foreseeable future including but not limited to:
a) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to the incidental visitations, communications, contributions and
b) the maintenance of regular contact or communications with guardian or other custodian of the child.
The court finds that the visitation by the mother has been inconsistent and irregular, that the mother has failed to take any substantial action to correct the numerous dysfunctional aspects of her mother has failed to take any substantial action to correct the numerous dysfunctional aspects of her personality. She has failed to maintain a stable home and has offered no plan for the care of this child in the future. She has managed her affairs in such poor fashion that she is now incarcerated.
(7) The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other persons or by the economic circumstances of the parent. While it is observed that the mother has very limited funds available to her, principally from social security, economic factors did not prevent regular and continuing contact with the child nor did they impact on the availability of services for her. DCF attempted to encourage contact with the child. No unreasonable conduct by DCF is noted. The father showed no interest whatsoever in having a meaningful relationship with this child. The services that were offered to Vanessa were free, available and appropriate. She refused individual, group and parenting counseling. There is no question but that Vanessa would have benefited greatly from counseling and therapy. Our law does not permit DCF to compel participation in therapy or counseling. Vanessa knew or should have known, on some level, that her refusal to address her own problems would ultimately result in the permanent loss of her child.
ORDER
CT Page 2726
Having considered the foregoing facts it is found by clear and convincing evidence to be in the best interest of Caresse B. for the parental rights of her biological parents to be terminated so that she may be placed in adoption without further delay.
It is therefore ordered that parental rights of Vanessa B. and Juan G. be and hereby are terminated. It is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent for the purpose of placing the child forthwith in adoption and to report to this court in writing as to the progress toward that end no later than 90 days from the date of this judgment. If adoption has not been finalized within six months from the date of the judgment, the Commissioner is further ordered to submit a motion to review a plan for terminated children as to this child no later than that date to ensure compliance with federal law which mandates judicial review of every child and the guardianship of this date.
While the respondent mother speculates that the present foster mother may not adopt the minor child such a situation does not prevent the court from acting at this time. The Supreme Court has stated:
 This court agrees that termination of parental rights as part of the adoption process; it is clear that adoption cannot proceed unless the parent's rights are terminated in the first instance. The converse is not true. The parent s rights can be terminated without an ensuing adoption. When both parent's rights are terminated it becomes the obligation of the state to look for permanent placement for the child or children. In Re: Theresa, 196 Conn. 18, 30 (1985).
The court finds that in certain cases such as the present case it is appropriate and in the best interest of the child to terminate the parental rights irrespective of whether the foster mother intends to adopt or not. The state is required under existing Connecticut law to develop a permanency plan and the court is required to review that plan in court until a proposed adoption plans has become finalized. General Statutes §17a-112 (I).
Judgment may enter accordingly.
FOLEY, J. CT Page 2727