MEMORANDUM OF DECISION
On June 9, 1997, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Sandy N. and Steven N. to their two children, Steven and Marcus, now ages nine and a half and eight. The boys came into foster care after efforts to work with their mother and provide intensive support in the home failed in June, 1994. The mother, Sandy N., who has a past psychiatric history, was completely unable to manage the boys, who were out of control. Their father had left the household and could not care for them, given his past history of psychiatric problems, alcohol and drug abuse. Both children were adjudicated neglected as their parents did not provide proper care and attention for them and they were CT Page 11216 being permitted to live in conditions, circumstances and associations injurious to their well-being. Also, the court concluded that their home could not provide the specialized care the two boys needed. On March 26, 1996, Steven and Marcus were committed to DCF and have remained committed since that date.
The termination petitions against the parents allege four grounds. The first ground is that both parents have abandoned the children. Second, the claim is that the children were previously adjudicated neglected and that the parents have failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, they could assume a responsible position in the life of the children. The third claim is that each of the parents has committed acts of omission and commission in violation of Connecticut General Statutes § 17a-112(c)(3)(C) in that the children have been denied the care, guidance or control necessary for their physical, educational, moral or emotional well being. Last is the allegation that neither of the parents has an on-going relationship with Steven or Marcus, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the children and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the children. Connecticut General Statutes § 17a-112(c)(3)(A), (B), (C) and (D).
The court finds that both parents were personally served with the petitions and have appeared through court-appointed counsel. The father did not appear at trial, although his counsel attended and provided the court with information concerning his considerable efforts to locate his client. The court has jurisdiction in this matter and further finds that there is no pending action affecting custody of Steven and Marcus in any other court. Trial on the termination petitions commenced on August 31, 1998, continued on September 2, 1998 and concluded on September 4, 1998.
 1. FACTS
The court has heard the testimony from the DCF investigative worker and the DCF social worker, Sandra Fitzpatrick and Tammy Paolino respectively, as well as an additional DCF investigations social worker, Rhea Witherspoon and a DCF office assistant, CT Page 11217 Angela Smith. Althea Marshall, a clinician in the foster care program and with Boy's Village Youth and Family Services testified as did Rene Vitali, a therapist who conducted supervised visits between Steven and Marcus and their mother in 1996. Dr. Bruce Freedman, the court-appointed psychologist who evaluated the family on three occasions testified. The court also heard from the therapeutic foster mother, with whom Marcus still resides. On behalf of the respondent mother, Dr. Kinsom Lee, a psychiatrist from Waterbury Hospital, testified about her treatment at the outpatient psychiatric facility there. In addition, the parties introduced fourteen exhibits. The court makes the following findings and the reasonable inferences supported by those findings from the evidence presented at trial.
A. As to the father, Steven N.
Steven N. did not attend the trial and has not been involved with either of his children since 1996, when the visitation he had with the boys ended due to his inability to regularly attend and his failure to reschedule such visitation. He freely admitted his extensive psychiatric history to DCF when DCF became involved after referrals were received concerning the two boys, Steven and Marcus. Steven and Sandra N. were married in 1989. By 1994, they separated because of domestic violence between them. Shortly prior to their separation, Steven N. had broken his wife's nose during a fight which the children witnessed. He admitted that he had been diagnosed with paranoid schizophrenia at age eighteen and that he had been hospitalized on at least four occasions. He also admitted to abusing alcohol and drugs.
During the pendency of the proceedings, for a period of time he enjoyed visitation with is sons. Dr. Freedman reported that he saw a good relationship between Steven and the children. However, Steven was unable to sustain this level of functioning and by October of 1996 had begun to consistently miss visitation. Rhea Witherspoon, the DCF investigations worker, testified in graphic detail about the dramatic and visible changes in him. She last saw Steven on December 30, 1996, when he came to DCF to discuss why he no longer attended visits. He had lost a substantial amount of weight, was jittery, nervous, unshaven and smelled of alcohol. Ms. Witherspoon further testified that Steven was using drugs, drinking whiskey, and taking the psychotropic medication Haldol. Moreover, he had been hospitalized twice, lost his job and apartment, had been arrested and was living in a homeless shelter. Tammy Paolino, the DCF case worker, testified that some CT Page 11218 weeks prior to trial, she saw him on a street corner associating with a known prostitute and that it was the first time she had seen him in over a year. Since December 30, 1996, he has not had contact with the children, DCF or indeed his own lawyer. The court finds, from the evidence, that Steven N. was aware of the court proceedings and their importance. The court further concludes that he no longer wanted to remain a visiting resource or presence in his children's lives. Despite his claims and desires as relayed by his counsel, the court concludes that Steven N. has abandoned his sons by his return to a street life and drug use.
B. As to the mother, Sandra N.
Dr. Bruce Freedman, a clinical psychologist with a specialty in family studies, conducted evaluations of the family in August, 1994, June, 1996 and in June, 1998. He concluded that Mrs. Newman was not psychologically capable of caring for the children. His clinical assessment indicated signs of severe mood swings over the years, including a manic depressive diagnosis. In addition, Dr. Freedman stated "she is a very angry person, particularly with authority figures or anyone who is telling her what to do. She gets into a lot of fights and has trouble getting along with them." Moreover, "her degree of insight shows very little ability to understand her own limitations. It is only in this way that she can fantasize about caring for a child like Steven." Dr. Freedman testified that "Steven is a boy with very severe attention, emotional and behavioral problems. Sandy was never able to control him or provide structure for him, and she is not able to do so now." Moreover, Sandra made it clear to Dr. Freedman that she is not interested in rehabilitating, when she declared that she did not need professional help, that there was nothing anyone could do to help her, and that even medication did not help. Dr. Freedman opined that this mother is not capable of raising a child to maturity and no amount of psychological help will rehabilitate her.
Sandra's inability to benefit from therapy was also demonstrated by the testimony of Dr. Kinsom Lee, who had treated her over the course of several years at the outpatient psychiatric clinic of the hospital providing service to the area in which she resided. He testified that he first treated Sandra in 1991 and identified her difficulties as stemming from depression, for which he prescribed medication. His role, he stated, "was to help her deal with the issues [concerning the CT Page 11219 loss of her children] and to support her." He admitted that he had not sought external verification of the information Sandra provided nor sought to determine the level of her functioning in society. He also found that Sandra did not make progress in the group sessions she attended. All that resulted from her attendance was a repeated opening of her emotional wounds, which did not help her deal with her sense of loss, he stated. As a result, he testified, a mutual decision to discharge her from her second course of treatment from 1995 to 1997 was reached in early 1997. Dr. Lee testified further that he had never seen Sandra with her children and could provide no opinion about her parenting abilities.
C. The two children and their problems over time.
This family was initially referred to DCF due to Sandra's poor control of the children and her failure to set and enforce reasonable standards. Dr. Freedman testified that her mental and emotional problems deeply infected these two boys. In evaluating them, he found that both boys were extremely active, had behavioral and emotional problems, were hard to handle and not used to a lot of structure or routine. However, Dr. Freedman concluded, even at the time of the initial placement, Marcus, the youngest child, was not a significantly disturbed boy. He stated that because of his early life in Sandra's chaotic home, he looked like a disturbed boy. Steven, on the other hand, was severely disturbed, having lived in this extremely chaotic home for a longer period of time, where both parents exhibited psychiatric difficulties. In fact, Steven was so disturbed, that he could not settle down and be maintained in the specialized therapeutic foster home in which he was placed. In March, 1996, he cut his forehead and arm with a razor blade, and when sent to his room, burned his arm with a lamp and later burned up his jeans and sheets. His justification for such dangerous and self-injurious behavior was that "it was something to do." Later that same year, in December, 1996, Steven was removed from his foster home, after destroying his room and attempting to harm himself by ramming his head against the wall and cracking his rib on the side of his bed. He was initially taken to Waterbury Hospital and then admitted into Elmcrest Hospital for psychiatric treatment. He was eventually placed in residential treatment at Devereaux, a group home, where he remains today.
 2. BURDEN OF PROOF AND STATUTORY PROCEDURE
CT Page 11220
Termination of parental rights is statutorily defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except it shall not affect the right of inheritance of such child or the religious affiliation of such child." See Connecticut General Statutes § 45a-707(8). It is a judicial matter of exceptional gravity and sensitivity. Anonymous v. Norton, 168 Conn. 421, 430,362 A.2d 532, (1975). Termination of parental rights is the ultimate interference by the state in the parent-child relationship and, although such judicial action may be required under certain circumstances, the natural rights of the parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v.Illinois, 405 U.S. 645, 651 (1972); In re Juvenile Appeal(Anonymous), 177 Conn. 648, 671, 420 A.2d 875, (1979).
Both the child and the parents have a constitutionally protected interest in the integrity of the family. Santosky v.Kramer, 455 U.S. 75 (1982). The rights of parents to the custody of their children is an important principle of constitutional dimensions. In re Juvenile Appeal, 187 Conn. 431, 435,446 A.2d 795, cert. denied 193 Conn. 802, 474 A.2d 1259 (1984). The constitutional guaranty of due process of law requires that the statutory ground(s) for termination of parental rights be established by "clear and convincing evidence," not merely a fair preponderance of the evidence. Connecticut General Statutes §17a-112(b) and Connecticut Practice Book § 3.4, as amended, mandate the standard of proof as "clear and convincing evidence."In re Juvenile Appeal (84-3), 1 Conn. App. 463, 473 A.2d 795, (1984).
In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition, as of the date of filing or the last amendment, by clear and convincing evidence. In re Theresa S., 196 Conn. 18, 491 A.2d 355, (1985), e.g. Connecticut General Statutes § 17a-112(b). Only one ground need be established for the granting of the petition. Inre Juvenile Appeal (84-BC), 194 Conn. 252, 479 A.2d 1204, (1985);In re Nicolina T., 9 Conn. App. 598, 520 A.2d 639, (1987). Trial proceeds in two stages: the adjudicatory and the dispositional phases. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. In re Juvenile Appeal (84-AB), 192 Conn. 254, 269, CT Page 11221471 A.2d 1380, (1984); In re Luke G., 40 Conn. Sup. 316, 324,498 A.2d 1054, (1985). Establishment of one or more of the statutory grounds is a mandatory prerequisite to the dispositive stage: an inquiry regarding the ultimate best interests of the children. Section 17a-112(b) of the Connecticut General Statutes sets forth the statutory grounds for termination. Since the language is set out in the disjunctive, as previously stated, one ground only need be established for the granting of the petition. Section17a-112(d) of the Connecticut General Statutes sets out the specific findings a court must make to determine that termination of parental rights is in the children's best interest.
 3. TERMINATION ADJUDICATION
The court will first review and consider the facts as they relate to the adjudicatory grounds alleged against Sandra and Steven N., as required by the statutes and the case law.
A. Abandonment
The court finds, by clear and convincing evidence, that the termination grounds pursued at trial against Steven N. have been proven. The first of those grounds, abandonment, focuses on the parent's conduct. In re Michael M., 29 Conn. App. 112,614 A.2d 832 (1992); In re Rayna M., 13 Conn. App. 23, 36, 534 A.2d (1987); In re Kezia M., 33 Conn. App. 12, 632 A.2d 1122 (1993). "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In Re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14, 438 A.2d 801 (1981). Steven N. has not pursued visitation with Steven and Marcus and has abandoned them completely.
The court further finds from the evidence that DCF has not sustained its burden of proof on the abandonment grounds against Sandra N. Although she has not visited the children since October, 1996, the decision to terminate visitation was not made by her voluntarily but through actions taken by DCF to protect the two boys from the consequences of continued contact with her and from Marcus's refusal to continue to visit with her. She has maintained her interest in her children, vigorously contesting the termination petitions.
The two incidents which resulted in young Steven's removal CT Page 11222 from his foster home occurred shortly after visitation with Sandra in the spring of 1996 and after discussion of future visitation with his mother between DCF and this troubled young boy. Ms. Rene Vitali, a licensed clinical social worker, was retained by DCF in 1996 to conduct therapeutic visitation sessions between Sandra and her sons. Ms. Vitali observed the interaction patterns between the children and their mother. Marcus, she testified, did not appear connected to his mother, but behaved as though he was in the principal's office, giving one or two word answers to questions and the child was very wooded and one-side. Both boys appeared anxious and nervous. After the first visit in the fall of 1996, Marcus refused to visit again. Sandra spoke to Steven at this visit in a way which deeply concerned Ms. Vitali. Sandra stated to her son that he should be a really good boy, so that he could visit with her again, in effect placing the blame for this situation on the shoulders of this disturbed and psychiatrically vulnerable child. Ms. Vitali stated that she concluded further visits between Steven and his mother had great potential to decrease his coping skills. She saw no bond between the boys and their mother and recommended that visitation cease. There has been no contact between Sandra and Steven and Marcus since that date. While the observations and conclusions of Ms. Vitali and Dr. Bruce Freedman are of great importance as to Sandra's parenting abilities and her rehabilitation as a parent, the facts do not warrant a finding of abandonment of the boys by her.
B. No ongoing relationship
The court further concludes from the clear and convincing evidence that Steven N. has no ongoing relationship with his children. "The question is whether they (the facts) substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment." In re Midaglia M.,6 Conn. App. 194, 211, 504 A.2d 532 (1986); In re Juvenile Appeal (84-3),1 Conn. App. 463, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984); In re Juvenile Appeal (Anonymous),177 Conn. 648, 670-671, 420 A.2d 875 (1979). That question is clearly answered by the clear and convincing evidence before the court. The relationship between these children and their father terminated in December 1996, and Steven N. has done nothing to reestablish it. There is no reason to believe that there is any CT Page 11223 future hope for such action on his part.
Sandra N. also has no ongoing relationship with her children. Prior to the cessation of visitation on 1996, her relationship had significantly attenuated. She claims, through counsel, that this loss of the relationship is due to DCF's removal of her children from her care. While there is certainly some truth to the assertion that restricted supervised visits of one hour per week while children are in the care of others can diminish the connection children have for their birth parents, the testimony of Dr. Freedman is that this is not always so and it depends both on the child and in part upon the quality of the relationship that had been established. Nonetheless, the court concludes that the problems concerning visitation between Sandra and the boys do not relate so much to their separation from the mother, but to Sandra's inability to come to terms with her own personal problems and to learn to parent her children appropriately.
In Dr. Freedman's opinion, there is no bond between Sandra N. and Marcus. Steven had a dim idea of who his mother was and dim feelings about her, but not a parent-child bond. Dr. Freedman testified that when he observed the boys with their parents, neither child expressed an interest in either parent. The children's relationships with their parents are irreparable at this point in time. He found Sandra's ability to care for the boys a fantasy, as she could not handle Steven even for an hour. The court further concludes, given Sandra's unwillingness and inability to engage in meaningful counseling and rehabilitation, that establishment of an ongoing parent-child relationship at some time in the future is not likely. The court concludes that these circumstances have existed for a period longer than one year prior to the filing of the termination petitions on June 9, 1997.
C. Acts of Omission and Commission
With respect to the ground that the children have been denied by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for their physical educational or emotional well-being, the court finds that this ground has also been established by clear and convincing evidence against both parents. "This provision authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child." In re Kelly S., 29 Conn. App. 600, 614, 616 A.2d 1161
CT Page 11224 (1992). See also In re Theresa S., 196 Conn. 18, 25-27,491 A.2d 355 (1985); In re Sean H., 24 Conn. App. 135, 144-145;586 A.2d 1171, cert. denied, 218 Conn. 904, 588 A.2d 1078 (1991). The language of Connecticut General Statutes § 17a-112(c)(3)(C) does not limit the grounds to acts resulting in physical injury only, In re Theresa S., supra; In re Sean H., supra, but may also apply to an act of omission which results in emotional injury to a child.
The parents of Steven and Marcus had a very troubled relationship, marked by substance abuse, extreme domestic violence, infidelity and psychiatric problems. The evidence has established that both children witnessed their father break their mother's nose. What other events they may have observed in the household is not known with any precision, but that it was turbulent, violent and chaotic was abundantly apparent while the children were in their mother's care when DCF was providing protective services in 1994. While in their mother's care, Steven and Marcus were frequently observed to be unkempt, unruly, uncontrollable and aggressive. Sandra Fitzpatrick, the DCF investigations worker, testified about her observations of the children's conduct in their home. She saw them running and screaming through the apartment, they would not listen to their mother and she could not properly discipline them, despite parenting training. Ms. Fitzpatrick also testified to events which occurred in 1994 when transporting the family to Newington Children's Hospital. The boys could not be made to stay buckled in their seat belts during the trip. They swore, spat and kicked, making the situation in the car dangerous. Once in the hospital, they ran, swore, screamed, hit the nurses, hit other children and continued to spit. Sandra took no action to control them and had no response other than to say "see what I have to go through." Further, Ms. Fitzpatrick described a scene at the hospital in June 1994. When Marcus bit and kicked his brother, Sandra took the child to an adjacent room and shortly thereafter the staff heard a blood curdling scream. When they investigated, they found Sandra, a large and substantial woman, physically laying on top of Marcus, who was then four years old. In addition, Althea Marshall, a DCF social worker, testified that this family was terminated from riding in the van to the hospital, because their behavior made driving them so dangerous.
The testimony catalogues just some of the many occasions on which Sandra's gross parenting failures were visible and demonstrated to others. Her inability and failure to provide CT Page 11225 structure and control for the children was both physically and emotionally damaging to them. Her acts of both omission and commission as a parent and their injurious impact on her sons has been proven by clear and convincing evidence. There is also no doubt that these acts continued for a period of time greater than one year prior to the filing of the petitions for termination of parental rights.
D. Failure to Rehabilitate
The court concludes from the clear and convincing evidence that both parents have failed rehabilitate. Steven and Marcus were previously adjudicated neglected and both parents have failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, they could assume a responsible position in the life of the children. "`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532
(1986). See also: In re Juvenile Appeal, 1 Conn. App. 463, 477,473 A.2d 795 cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).
In the father's case, the evidence has shown that he has returned to his previously drug-addicted street life and cannot assume a responsible position in the lives of the children, now or at any time in the foreseeable future. In Sandra's case, she has made no progress in understanding her own psychiatric impairments, her faulty parenting abilities nor has she begun to address these issues in any way. In January 1994, the DCF Family Preservation worker, Althea Marshall, began working with Sandra on behavior modification, parent education and coordinating services. Although Sandra did attend parent education classes, by April 1994 she said there was no more that she could learn and that the classes did not work. Moreover, despite repeated reminders by Sandra Fitzpatrick, the DCF investigative worker, that if visitation were to continue, mother needed to address her significant psychiatric issues, Sandra did little to obtain psychiatric help. Even the testimony of a witness called by Sandra, Dr. Lee, supports this conclusion. These children were adjudicated neglected on March 26, 1996. They simply cannot wait any longer for their mother to be rehabilitated as they have immediate and strong needs for permanency. By June 9, 1997, although Sandra N. had taken some steps to accomplish rehabilitation, her relationship with the children remained CT Page 11226 ominous, in which she could not understand, comprehend or minister to these children's significant specialized needs. Rehabilitation within the foreseeable future is not likely. The court finds, based on the clear and convincing evidence, that this ground had existed for substantially longer than one year prior to the filing of the termination petitions on June 9, 1997.
 4. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e):
1) Appropriate and timely services were offered by the Department of Children and Families, including intensive family preservation programs, counseling, child guidance counseling, Rescue Head Start, preschool intervention program, Infant Toddler Program and PEDAL program at Newington Children's Hospital, parent aide, parenting classes, respite care, visitation and transportation assistance.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. Sandra received substantial services to assist her in rehabilitation and reunification. Although she made initial efforts to participate in the services offered to her, she did not complete any of the programs, and she was never able to gain the level of insight into her parenting deficits or her mental illness to be rehabilitated as a parent. Steven N., the father, was offered ongoing and significant services for reunification, but did not take the steps necessary to rehabilitate himself.
3) The Department entered into reasonable and realistic court expectations on March 27, 1996, in order to reunify the family. Neither parent has been able to meet those expectations.
4) Steven and Marcus do not talk about their parents, and do not ask to see them. Both children have ties to Marcus' foster parents and perceive them to be their psychological parents. Marcus has stated several times, "I don't ever want to see [my mother] again," and has said he doesn't care if he ever sees his father again. Steven says he wishes his biological father "would be canceled forever." Steven avoids discussing his biological mother, and severely acts out when she is mentioned. CT Page 11227
5) Finding regarding the ages of the children. Steven is nine years old, and Marcus is eight years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of these children to return to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. Steven N., the father, has not maintained contact with these young children and has done nothing to adjust his circumstances to make it in the best interests of the children to be returned to him. Sandra N., the mother, made minimal attempts to participate in therapy, refused to cooperate with DCF and has been aggressive and threatening toward service providers. Steven and Marcus have not seen their mother since October 1996, nor their father since November 1996. Neither parent has sent them cards, letters or gifts. Steven and Marcus have emotional difficulties, and severely acted out after visits with their parents. They have no positive memories or feelings for their parents and they do not want to see them any more.
7) Finding regarding the prevention of the parents from having a meaningful relationship, etc. DCF has taken many steps to encourage both parents to rehabilitate themselves and to have a meaningful relationship with their children. Neither parent had been able to accomplish this. The court further finds no inappropriate conduct on the part of DCF.
 5. DISPOSITION
Having determined that the grounds for termination against Sandra and Steven N. have been proven by clear and convincing evidence, the court will now consider whether termination is in the children's best interests.
Marcus has been in foster care since June 8, 1994. Since that time, Steven has had two psychiatric hospitalizations and has been in residential placement at Devereaux since February 5, 1997. Both children are in need of permanency. Marcus's foster family loves him and wants to adopt him. Steven and Marcus visit each other once a month, they get along well together and they CT Page 11228 enjoy seeing each other. When Steven is released from Devereaux, DCF hopes to place him near Marcus so that they may stay in contact with each other. The parents have had four years to improve their circumstances and learn to parent these children. Giving them any more time and leaving the children's future undecided is not in their best interests. The court concludes, based on the clear and convincing evidence, that termination is in their best interests. Accordingly, a termination of the parental rights of Sandra N. and Steven N. is ordered. It is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent for Steven and Marcus for the purpose of securing an adoptive family and a permanent placement for them. If Marcus's present foster family remains willing to adopt him, it is the court's direction that they be given first consideration. In addition, the Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placements and file further reports as are required by state and federal law.
Barbara M. Quinn, Judge Child Protection Session