MEMORANDUM OF DECISION
On April 21, 1997, the Department of Children and Families, hereafter "DCF", filed neglect petitions for Lorenzo M., born July 16, 1992 and his younger brother, Antonio M., born April 28, 1993. The father of the children, Antonio v. is deceased. On April 17, 1997, the children were placed in foster care after a referral to DCF was made three days earlier by Lorenzo's school, reporting that Lorenzo had a scar under his left eye and that the child stated his "Mommy" did it. Investigation by DCF revealed that the mother, Lynn M. had thrown a shovel at her son, after telling him she would do so if he did not obey her. When he did not obey, she threw the shovel which hit him in the face, causing a mark still visible a month later.[2]
On April 21, 1997, DCF secured an ex parte order of temporary custody which was confirmed after several days of trial, hereafter referred to as the "OTC hearing" on May 29, 1997. On May 27, 1997, the court ordered the neglect matters for both boys consolidated for trial and that all evidence presented in the OTC hearing would be evidence at the neglect trial. (McLachlan, J.). On November 5, 1997, DCF amended the neglect petition as to Antonio, the younger child, and also filed a petition for the termination of parental rights as to him.
DCF alleges that both Lorenzo and Antonio were neglected in that the children are being permitted to live under conditions, circumstances or associations injurious to their well-being. The termination petition alleges that Antonio has been denied, by reason of an act of parental commission or omission, the care, guidance or control necessary for his physical, educational, or emotional well-being. Connecticut General Statutes § 17a-112(c) (3)(C).
The court finds that the mother was personally served with the petitions of neglect and for termination and has appeared through court appointed counsel. The court found, from the evidence, that the father of the children is deceased and had died prior to the events which led to the pending petitions. The court finds that proper notice has been given all parties in CT Page 9550 accordance with the law. The court has jurisdiction in this matter and further finds that there is no pending action affecting custody of Lorenzo or Antonio in any other court.
The court heard two days of testimony from the DCF worker as well as the court-appointed psychologist, Dr. Bruce Freedman. Lorenzo's primary therapist testified as did Antonio s foster mother. The court also heard the testimony of the respondent mother's nine witnesses as well as from Lynn herself. In addition, twelve exhibits were introduced into evidence. The court also considered the trial transcripts of the contested OTC hearing as well as the exhibits introduced in that trial, in accordance with the previous court ruling. Lynn M. attended the trial and, through her counsel, vigorously contested the petition.
The court makes the following findings and the reasonable inferences supported by those findings from the evidence presented at trial:
 1. FACTS
The mother herself admits to the salient facts surrounding the incident in which she threw the shovel at her oldest child, Lorenzo. Lorenzo, then age four, was attending school in the mornings, a school in which he had been placed after having been evaluated and determined to require special education services. His mother testified that he hated to get on the bus for the hour long bus ride required, as he could not easily sit still, buckled into his seat during that time. There were days when she could not get him on the bus and he did not attend. On other days, it took her efforts and the efforts of the aide on the bus to get Lorenzo to go, literally kicking and screaming all the while. One morning in late March of 1997, Lorenzo was again acting out and refusing to go. His mother told him "If you do not get on the bus, I'm going to throw the shovel at you." Lorenzo did not obey and Lynn threw the shovel and as she stated "he turned and caught it in the face."
She was hysterical after the event, her sister, Jane Borrelli testified. She called her sister to come over and they both decided the child did not need medical attention. Lynn claimed under oath at the OTC hearing that it was a plastic shovel she threw and that it did not hurt him. The court cannot, in view of the evidence and the photograph of Lorenzo taken by DCF nearly a CT Page 9551 month later, credit this statement as a red mark under his left eye about four inches long was still clearly visible at that time.[3]
That the injury was more than Lynn was and is prepared to admit is also evidenced by the events which followed the incident. Lorenzo did not go to school for almost two weeks afterward. During the first week, Lynn called the school and variously reported that he was hit in the face and that he had a cold. Nonetheless, on the day that he returned to school some twelve days after the event, the injury came under public scrutiny for the first time and Lorenzo was asked what had happened. Lorenzo told the teacher's aide, "Look at what my Mommy did to my face. She hit me with a shovel. She said she was going to make me behave." Upon his report that his mother caused the injury, the school made a referral to DCF and the investigation which resulted in the removal of both Lorenzo and Antonio from the home ensued.
The DCF investigations worker, Jay Alvarado, testified at the OTC hearing that Lynn was hostile and uncooperative. She had complained to him that Lorenzo was impossible to control, that he was hyperactive, did not sleep and could not follow directions or obey regular discipline. On the basis of her statements and his observations, he arranged to have Lorenzo evaluated by a psychiatrist at the Child Guidance Clinic. During this session, which only lasted twenty minutes, Lynn herself was out of control and would not provide the intake information required. When Dr. Chartouni suggested that Lorenzo have an emergency psychiatric evaluation, Lynn stormed out of the session, tearing up the release form which she had not yet signed. Ominously, she stated to the psychiatrist that Lorenzo was out of control and that she "could kill him."
Lynn's unwillingness to cooperate with the authorities and her denial of her physical abuse of Lorenzo caused DCF to move forward to invoke the ninety-six hour hold and place both boys in foster care on April 17, 1997. Subsequent to the removal of the boys, their disclosures and the events in the household confirmed by others told a story of a mother who exercised bad judgment in her choice of partners, had frequent moves and was overwhelmed in the months just before the removal of the boys with the care of her special needs child, his younger sibling and her own illnesses. Her sister testified that four days before the removal of the boys by the authorities, she had told her sister she and CT Page 9552 her husband would take them during the upcoming workweeks so that Lynn could get back on her feet. But the family problems and the boys' difficulties with their mother and with her boyfriend, Louis M., were not met informally by the assistance of her sister and other community resources as Lynn did not permit this to happen.
For the boys, the involvement of the child protective services would prove beneficial as the problems of Lynn's inadequate parenting of Lorenzo and Antonio had a much deeper and negative effect on the boys than was at first known. In January of 1997, some three months prior to the shovel incident, DCF had conducted a brief investigation of Lynn and Lorenzo when the school reported that the child had some bruises he stated were inflicted by his mother. Lynn reported that Lorenzo never slept through the night and during one night, she woke to find him up, trashing his room. When she pulled him back from a screen door, he ran into a bureau and hurt himself. He reported his mother pushed him into the bureau. What is clear is that she became very angry with him that night and that DCF substantiated abuse. Nonetheless, he was left in the home and the case was closed. Parenting classes were recommended for her which she did not attend.
After Antonio was placed in foster care, he immediately began to disclose sexual abuse by his mother. He disclosed to his foster mother, in the next several days whenever he was bathed by her, that his mother "pulled his pee-pee, stuck a needle into it, sucked it and hit it." Both Lorenzo and Antonio have uncircumcised penises and were and are subject to infections as a result. The foster mother, whom Lynn accused of touching her son and coaching him to say these things, testified that she never touched him there, but always gave him the ointment and lotion with which to clean himself. In May and June of 1997, Antonio was interviewed by Martha Pawlak at the Child Guidance Clinic and a member of its Child Sexual Abuse Team on three separate occasions concerning the statements he made to his foster mother. Ms. Pawlak was unable to secure any information from him to confirm the abuse and she stated that her investigation was inconclusive. Nonetheless, because of Antonio's behavior in these sessions, his withdrawal and his curling up in a fetal position at one point, she was concerned about him.
In addition to the disclosures Antonio made to his foster mother, he also disclosed sexual and physical abuse by his mother CT Page 9553 and Louis to the DCF social worker, Jennifer Carey. Once on June 12, 1997, he stated that "Louie and Mommy choked me and held me under the water," he added "Mommy sucked my pee-pee and hit me." He also stated during a car ride with her in July of 1997 that "Louie is bad because he hits — he hits hard and it hurts."
Both Lorenzo and Antonio began to talk about how they disliked "Louie", who they thought was their father. "He hit with a belt" and they were scared of him. Lynn denied that Louis ever hit her children, although she did admit that he was alone with them at times. She also claimed that the children's statements were untrue because Louis was out of her life months before the events which led to the children's removal. But her own sister testified that the relationship with Louis M. ended in February of 1997. And shortly thereafter when the DCF investigation began in April of 1997, Lynn herself introduced Louis to the investigations worker as her boyfriend. Again, the court cannot credit her testimony and concludes from the evidence that Louis was involved in her life until at least February of 1997. He was an active and negative participant in the boys' family life, even if at that time he did not regularly reside with them any longer.
Also extremely troubling is testimony concerning an event in which Louis's son, Julio, was caring for Lorenzo either in late 1996 or early 1997. Lorenzo reportedly was out of contact and Julio strapped him into a chair and taped up his mouth. Lynn was in telephone contact with Julio at that time and approved of the discipline. At trial, she denied that this was so, but evidence before the court indicates that at the time, she reported earlier to DCF that indeed she was aware of the punishment and did acquiesce in it.
There is no question that Lorenzo was and is a difficult child to manage and has been diagnosed with Attention Deficit Hyperactivity Disorder. Lynn, however did and does not exhibit any understanding of Lorenzo's difficulties or empathy for him. Lynn could not cope with Lorenzo and viewed him as the difficult and troublesome one. She stated to a friend, Beth Santos, who stayed with her for two months in April of 1997, that Lorenzo was the `bad one' who hits his brother and Antonio was the good one. She exhibited, by her statements and behavior, no insight into the child's special needs. Despite her statements that she could not get help for him, when such help was offered, such as the emergency evaluation offered by Dr. Chartouni, she rejected it. She attributed all responsibility for Lorenzo's out-of-control CT Page 9554 behavior to the child and blamed him for the problems which resulted from her own inability to manage him. Her focus on Lorenzo as the "bad one" and Antonio as the good child also blinded her to Antonio's needs, for Lorenzo's acting-out not only led him to strike out in anger against the family dog and to break its leg, but also caused him to strike Antonio on a regular basis.
Dr. Bruce Freedman, the court-appointed psychologist who evaluated the family, confirmed in a more objective manner the impression of chaos, of an out-of-control child and his impact on his immediate family. He concluded that Lynn's emotions and worries got in the way of making decisions and her emotions often overran her ability to reason and plan things in an organized way.
He testified that Lynn had lower than average scores on the Rorschach tests. He stated the tests are a useful tool to assess how any new situation is sized up by Lynn. He concluded that her analysis would not be accurate. He also found that she could not set appropriate boundaries and manage the behaviors of the children. In his evaluation sessions in June of 1997, he concluded that she had trouble setting up even a basic situation with the children that went smoothly. When they did things that she did not approve of in the evaluation sessions, most of the time she did not take any action. At one point, Antonio said he did not like "Louie" because he hit him. When Lynn heard this, she raised her voice and told the child "don't lie". He felt that Lynn was at times trying to intimidate the children in his presence, which he testified was a "dangerous thing." Dr. Freedman concluded that Lynn's disorganization, her chaotic life, vague relationships with different men who were in and out of the family home caused her to fail to provide the structure that her boys needed from a parent.
Dr. Freedman in June of 1997 concluded from his interviews that both boys had mental and developmental limitations in different areas. During the interviews, Antonio made certain disclosures about sexual matters to him. The child talked about Louis's penis and how it became big. He stated that Louis sucked his pee-pee and he did not like it. He stated that "a spider web came out of Louie's pee-pee and then went back in." He then lapsed into fantasy which, Dr. Freedman concluded, reduced the credibility of the disclosure. In general, he noted that the disclosures were consistent with the material that Antonio had CT Page 9555 reported to his foster mother.
Both boys had trouble with physical coordination, Dr. Freedman found. He concluded that their limited coordination "suggested the need for structured physical activity and for careful supervision to avoid (injuries)." Their level of activity and their deficits in coordination would result in many bruises, he concluded. At trial, he testified, "both of them together required a high level of skill in a parent to provide them with a well-organized and stimulating environment to allow them to do "ok" in school and in life." He testified further that the mother did not demonstrate any capacity to meet those needs.
During his testimony before the court, Dr. Freedman believed that Lynn's failure to acknowledge the problems that the children had and her failure to admit to any wrongdoing would mean that her chances of rehabilitating to be a safe parent for the children were slim. As he had not seen Lynn or the children since 1997, his opinions were in response to hypothetical questions. He stated that it was important for Antonio, as well as Lorenzo, to have a stable home environment and structure. If Lynn had no understanding of these problems, he concluded that she could not provide a safe environment for the children.
Although most of the disclosures concerning sexual abuse came from Antonio, Lorenzo also made such disclosures to his therapist, Angelo Farenga, of the Wheeler Clinic. He told him about being tied up and having tape put over his mouth while in the care of his "step brother". He reported physical abuse and in the joint sessions with his mother, the child pointedly asked her if she was going to continue to hit him and asked if he was going to be tied up again if he misbehaved. He also expressed concern for Antonio and the manner in which his mother had touched the child sexually.
Mr. Farenga stated that Lorenzo was diagnosed with reactive attachment disorder, among other reasons because of his indiscriminately going up to strangers and acting as if he has known them for a long time. He also is able repeatedly to say goodbye to his mother without indicating an emotional response to her departure. Primarily, however, he was dealing with Lorenzo's reaction to abuse and his hyper-vigilance. He stated that Lorenzo is very tuned in to what goes on around him and tends to overact to things that another child could take into his stride. The therapist concluded this was a normal reaction to the CT Page 9556 abnormal circumstances the child found himself in the home. He testified that Lynn never acknowledged her role in this child's problems. Because of Lynn's behavior in the sessions and in the past, he also concluded that the child should not be placed with his mother at this time. Mr. Farenga testified that Lorenzo was hard for anyone to manage. He has been in three foster homes that he was aware of, and was hospitalized in November of 1997, because of behaviors that were dangerous to himself and to others. Since March of 1998, Lorenzo has been at a group home at the Wheeler Clinic.
Antonio's time since his removal from his mother's home has been less fraught with change and difficulty. He has been in the same foster home since his initial placement there in May of 1997. His foster mother testified that Antonio does not want to go home and does not want to visit with his mother and brother. After the visits that he has had with Lynn, he has tantrums, will not cooperate and it takes a few days to calm him down. Also before visits, she stated, he becomes withdrawn and talks about being a "bad boy". He was the victim of much aggression from Lorenzo, who would hit him with his toys and generally take out his negative emotions on his younger brother. This occurred even during supervised visitation and Antonio is wary of his older brother.
When Antonio was first placed in foster care when he was four, his foster mother testified that he did not know his numbers or colors. He started a pre-Kindergarten program and has just "blossomed." He gets along well with the other children in the home and with the children in his classes. He attends therapy, now once every other week, but until recently once every week. She stated that her family is very close to Antonio and that she and her husband wish to adopt him.
Since the time the children were removed from the home, DCF has offered services Lynn M. to assist her in securing the return of her children and rehabilitating herself as a parent. Many of those services she has rejected. The first offer was in January of 1997 when the initial investigation of possible abuse occurred. A parenting class was recommended which Lynn refused. Other services which were offered were case management services, individual counseling, counseling together with Lorenzo, an anger management class as well as visitation with the children and transportation as required. Lynn did not attend individual counseling. She did attend the sessions with Lorenzo at Wheeler CT Page 9557 Clinic, but was unable to benefit from them, as testified to by Mr. Farenga, the therapist. She did not follow through on the recommendations made or cooperate with the treatment plan in place for Lorenzo. She did complete a course in anger management at the Parent Education and Support Center of Family Ties.
Lynn M. testified at trial. She stated that she believed Antonio's foster mother coached him to make the allegations he has made, as the foster mother wanted to adopt Antonio. She also had stopped participating in the family therapy with Mr. Farenga and stated she believed Lorenzo was coached by his therapist. She stated that no one ever sexually abused her children. She stated she believes that Antonio may have seen an inappropriate sexual encounter with a relative. She testified that if someone could show her physical proof of such abuse, then she will seek counseling for herself and the children. Her testimony highlighted the fact that Lynn neither accepted responsibility for the many bad events which befell her children while in her care nor had benefited from any of the services offered to her. She showed no understanding concerning the psychological impact on Lorenzo of having his own mother engage in punishment which resulted in his injury by a shovel thrown by her at him. As to the relationship between Antonio and Lorenzo and her failure to protect her younger child from abuse by the older one, such thoughts seem now to be beyond her, although when the children resided with her, she was aware of Lorenzo physically acting out against Antonio.
 2. NEGLECT ADJUDICATION
April 21, 1997, by a preponderance of the evidence, indeed by clear and convincing evidence, the court finds that Lorenzo and Antonio were neglected in that the children are being permitted to live under conditions, circumstances or associations injurious to their well-being. Accordingly, the court finds that each was a neglected child pursuant to Connecticut General Statutes §46b-120. The mother's treatment of Lorenzo, by her inappropriate discipline with a shovel, to which she has admitted, makes such a finding as to Lorenzo clear and necessary. The court also finds that her failure to protect him from physical discipline by Louis M., her acquiescence in his treatment by Louis's son and her own management of the child support this conclusion.
As to Antonio, the court concludes from the evidence by a fair preponderance of that evidence that Lynn M. permitted CT Page 9558 Lorenzo to physically abuse the child and that Louis M. also physically abused him. While the testimony concerning Antonio's sexual abuse is fraught with issues of confirmation and some issues concerning its reliability, what is without question is that this child had sexually explicit knowledge beyond his years and that he was exposed in his own household to this, if not to actual sexual abuse, although such abuse appears likely. In particular, his older brother's fears on behalf of his brother and Lorenzo's confrontation of Lynn on this subject lend support to the conclusion that this child was not protected from Louis and that Lynn herself may have participated in Antonio's mistreatment.
 3. TERMINATION ADJUDICATION
The court finds, by clear and convincing evidence, that the termination ground pursued at trial against Lynn M. as to Antonio has been proven. Lynn M., if not by direct acts of commission, has committed acts of omission as to Antonio as defined by the statutory terms. Both children have suffered emotional and physical injury caused by their mother, Lynn M., although a termination of Lorenzo's rights is not sought at this time. The cases hold that "this provision authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child." In re Kelly S., 29 Conn. App. 600, 614, 616 A.2d 1161
(1992). See also In re Theresa S., 196 Conn. 18, 25-27,491 A.2d 355 (1985); In re Sean H., 24 Conn. App. 135, 144-145,586 A.2d 1171, cert denied, 218 Conn. 904, 588 A.2d 1078 (1991). Lynn's treatment of Antonio and her inability to protect him both from the acts of her boyfriend and from his own brother not only caused Antonio physical injury, but great emotional damage which continues to require treatment at the present time and is likely to require treatment in the years to come. Such treatment, fortunately for Antonio, given the stable emotional support provided in his new home, is no longer as intense or frequent as it was in the recent past. Antonio has immediate and strong needs for permanency. He has flourished in his new home and he cannot and should not wait any longer to begin his new life.
Also required for adjudication is a finding by the court that CT Page 9559 either the facts warranting the adjudication have existed for more than one year prior to the filing of the petition or that under the totality of the circumstances, it is in the best interests of the child that the time period be waived. Connecticut General Statutes § 17a-112(d)(1). Waiver of the one year requirement is within the court's sound discretion. InRe Romance M., 30 Conn. App. 839, 622 A.2d 1047, appeal dismissed, 229 Conn. 345, 641 A.2d 378 (1993). In Re Christine F,6 Conn. App. 360 (1986). The waiver is appropriate in this case where the biological mother has not benefited from the services offered to her and where her own son does not speak of her or wish to see her. She has not taken the steps necessary to learn how to provide a safe home for her son and is unlikely to do so in the reasonably foreseeable future. Waiting for the time required by the general provisions of the statute to pass until the one year has elapsed would serve no purpose and is not in the best interests of Antonio, who deserves permanency in his life.
 4. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were offered by the Department of Children and Families, including counseling, parent educational services, transportation assistance, and visitation assistance. Lynn, as previously found, has not participated in some services and was not able to benefit from others, given her attitude concerning the events which took place in the family.
2) The court finds, by clear and convincing evidence, that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. Without participation in the services offered by Lynn, without her acceptance of responsibility for the abuse which took place in the home and her acknowledgment of her own need to improve as a parent, further services would have been of no benefit toward any reunification.
3) The Department entered into reasonable and realistic court expectations in order to reunify the family. Lynn was not able to fully meet those expectations to reunify with her children.
4) The court finds from the evidence that Antonio has strong emotional ties to his foster family. He does not exhibit any CT Page 9560 attachment to his mother, who, as stated by Dr. Freedman, is unable to meet his needs and provide the structure and security he requires.
5) Finding regarding the age of the child. Antonio is five years and three months
6) Finding regarding efforts of the parent to adjust her circumstances, conduct or conditions to make it in the best interests of the child to return him to her home in the foreseeable future and (a) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. The evidence is clear that Lynn has done nothing to adjust her circumstances to make it in the best interests of Antonio to be returned to her. While she has visited to the extent permitted and expresses a desire to have Antonio returned to her, the personal changes required for her to learn how to parent him are lacking.
7) Finding regarding the prevention of the parent from having a meaningful relationship etc. DCF has taken many steps to encourage Lynn to have a meaningful relationship with the child and to rehabilitate herself, which she has been unwilling to accomplish.
 5. DISPOSITION A. Neglect Petition as to Lorenzo:
Lorenzo is in a group home at the Wheeler Clinic and requires considerable therapeutic support to maintain his emotional and psychological stability. The plan at present is to secure a therapeutic foster home for him when his treatment at the Clinic comes to an end. He has been vocal about the abuse he has suffered and the sexual abuse his brother suffered in their mother's care. He has some continuing and serious problems which required specialized treatment and care which his mother is unable to provide. Having adjudicated him a neglected child, the court concludes that it is in Lorenzo's best interests that he be committed to the custody and care of the Commissioner of the Department of Children and Families for a period of one year. His treatment is ongoing and benefits him and should be continued. CT Page 9561
B. Termination petition as to Antonio
Antonio has made great strides in his foster home. He is doing well in school and is close to his foster family that wishes to adopt him. In the months since his removal from the home in 1997, his mother has not made any progress toward being able to meet his needs and to provide a stable and nurturing home for him. Dr. Freedman testified that it might well take years of therapy before she could do so, if at all. Based on the foregoing findings, the court determines that it is in the best interests of Antonio that his mother's rights to him be terminated. Accordingly, a termination of the parental rights of Lynn M. to Antonio M. is ordered. It is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent for Antonio for the purpose of securing an adoptive family and a permanent placement for him. If Antonio's present foster family continue to wish to adopt him, the court directs that they be given first consideration. In addition, the Commissioner shall file with this court no later than ninety days following the date of judgment a written report of her efforts to effect such permanent placement and file further reports as are required by state and federal law.
Barbara M. Quinn, Judge Child Protection Session