MEMORANDUM OF DECISION
The Department of Children and Families (DCF) has filed a petition seeking to terminate the parental rights (TPR) of Joyce P. and James P. with respect to Teddy P., born on May 15, 1990. The petition asserts two grounds for the termination of the parental rights of the mother and two grounds for the termination of the parental rights of the father. The one common ground is that there is no ongoing parent-child relationship with respect to the mother and the father which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of the parent-child relationship would be detrimental to the best interests of the child. With respect to mother, DCF also claims that the child has been found in a prior proceeding to have been neglected and uncared for and that the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the CT Page 15420 child. With respect to father, DCF also claims that the child has been abandoned by the father in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. With respect to both parents, the petition alleges that the grounds have existed for not less than one year.
DCF also has pending a petition seeking an extension of the commitment of Teddy P. for an additional twelve months. The TPR petition and the extension petition were consolidated for trial by the court, Jones J., on April 9, 1998. Ruth P., the maternal grandmother, has been granted leave by the court, Jones J., to intervene in the TPR action for purposes of disposition only. In addition, the court, Brenneman J., appointed a guardian ad litem for Joyce P. on September 3, 1998.
The operative dates for the court's decisions on the TPR petition and the extension petition are as follows: adjudication of the TPR petition and the extension petition must be determined on the facts as of February 3, 1998, the date of the filing of the petitions. Disposition must be determined on the facts as of November 10, 1998, the last day of trial.
After hearing testimony and reviewing the exhibits and the court file, the court finds the following facts. Teddy P. was born on May 15, 1990. On January 12, 1996, DCF filed a motion seeking temporary custody of Teddy P. based on its claim that Teddy was in immediate physical danger and immediate removal was necessary to insure his safety. DCF also filed a neglect petition claiming that Teddy P. was being denied proper care and attention and that he was being permitted to live under conditions injurious to his well-being.
The neglect petition filed by DCF asserted that Teddy was living in hazardous housing conditions, including no flushing toilets and extreme clutter with old newspapers, trash and clothes piled high on the floors in every room and on all furniture, to the point that the family was residing in the basement. The petition further stated that the home was very dark, with blankets and plastic bags covering the windows. The petition also claimed that Teddy, who was five years old at the time, was not allowed to go outside and he was found to be wearing diapers and sleeping in a crib.
On January 12, 1996, the court, Sequino, J., granted an order CT Page 15421 of temporary custody giving custody of Teddy P. to DCF.
On May 14, 1996, after a contested hearing, the court, Sequino, J., committed Teddy P. to the care and custody of DCF for a period not to exceed twelve months based on the court's finding that the child had been neglected. The court found that Teddy had been medically, educationally and emotionally neglected. (Transcript of May 14, 1996 hearing at pp. 109-111.)
On July 29, 1997, the child's commitment to DCF was extended for an additional twelve months through May 14, 1998.
On February 3, 1998, DCF filed the subject petition seeking the termination of the parental rights of the respondents. A trial concerning the TPR and extension petitions was held on November 9 and November 10, 1998. Joyce P. and Ruth P., Teddy's mother and grandmother, respectively, were present throughout the trial. James P., Teddy's father, was not present in court for any of these proceedings.
Approximately one month after Teddy was removed from his home, he began evaluation and treatment at the Hill Health Center with Carol Dillingham, a child development specialist. Ms. Dillingham regularly performs evaluations of children in foster care and treats children with development problems. Ms. Dillingham first saw Teddy on February 15, 1996. Thereafter, she saw him on a weekly basis through June 1998 when his visits became biweekly. Teddy's presenting problems as described by his foster mother were ritualistic behaviors, obsessive compulsive behaviors, a limited range of affect, monotone speech, a fascination with the weather, problems sleeping and difficulty making decisions for himself. Ms. Dillingham conducted a number of development tests with Teddy. She determined that, while Teddy's overall development was within normal limits, he fell below normal in significant areas due to his limited exposure to the outside world and due to neglect. Ms. Dillingham concluded that Joyce P. did not let Teddy out of the house as a result of an exaggerated response to mother's concern about possible tick bites and the contraction of Lyme disease.
Ms. Dillingham' developmental evaluation of Teddy determined that:
 The content of his speech is deliberate, and he requires time to process thoughts because they don't come naturally CT Page 15422 due to limited experience in talking to others. Teddy displays limited spontaneous play rather mirrors action of others and performs parallel play rather than cooperative play. . . . Teddy has the need to control his environment due to a home which was disorganized and lacked routine and predictability. He used stereotyped behaviors such as mapping his environment; ritualistic mealtime bed preparation and washing of hands. Teddy requires guidance and prompting to perform activities of daily living including dressing and toileting(sic). He doesn't understand the consequences of his actions (a learned behavior). . . . The outcome of lack of experiences is a child who is unable to defend himself, assert himself or express himself. He has diminished coping abilities in a changing world. Teddy is unable to read and respond to the cues of others and communicate responsively.
Ms. Dillingham found that Teddy was "severely environmentally deprived" and initially diagnosed Teddy as having Reactive Attachment Disorder, Inhibited Type. The essential feature of Reactive Attachment Disorder is markedly disturbed and developmentally inappropriate social relatedness in most contexts that begins before age 5 years and is associated with grossly pathological care. In the Inhibited Type, the child persistently fails to initiate and to respond to most social interactions in a developmentally appropriate way. The child shows a pattern of excessively inhibited, hyper vigilant, or highly ambivalent responses. Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994) 299.80, p. 75.
Ms. Dillingham's evaluation of Teddy included an interactional study in which she observed the relationship between Teddy and his mother as well as Teddy and his maternal grandmother. Ms. Dillingham noted that mother displayed no affection or emotion towards Teddy and made no attempt to have physical contact with him. There was little communication between Teddy and his mother and little evidence of an understanding of each other's needs. She concluded that each of the three family members acted in isolation of each other.
After completing her evaluation, Ms. Dillingham began individual and family therapy for Teddy and his family. Approximately 75 to 80 family therapy sessions were held. The ultimate goal of these sessions was the reunification of Teddy with his mother. Ms. Dillingham attempted to improve Joyce P.'s parenting skills, increase familial communication and improve the CT Page 15423 parties' emotional ties.
The family therapy sessions conducted by Ms. Dillingham lasted eighteen months until the summer of 1997. According to Ms. Dillingham, the family therapy sessions were not productive. No significant progress toward any of the goals of therapy was achieved. Joyce P. failed to display any insight into her own behavior or any understanding of the techniques offered by the therapy for changing her behavior. She also demonstrated an unwillingness to change her conduct. Unfortunately, Joyce P. took the position that neither she nor Teddy had any problems that merited attention.
During this period, Joyce P. visited with Teddy at the therapy sessions and during separate visits that were held twice per week and supervised by DCF. On June 25, 1997 and on July 3, 1997, Teddy's attorney filed motions to terminate visitation with his mother on the grounds that the visits were having a detrimental impact upon him. Teddy's foster mother reported that he was vomiting, picking at his scalp, soiling his pants and experiencing periods of severe social withdrawal. On July 11, 1997, after a contested hearing, the court, Jones J., terminated Joyce P.'s visits with Teddy. While Ms. Dillingham's individual therapy sessions with Teddy continued, the family therapy sessions with Joyce P. also ended at this time.
According to Ms. Dillingham, Teddy was "a strikingly different child" after the termination of visitation. Teddy showed marked improvement and began developing much more normally. His periods of anxiety and withdrawal became milder and more transient. His coping skills and his ability to relate his feelings improved.
Teddy's mental state and his development have continued to improve while he has been in therapy and in foster care due to his exposure to the outside world, the nurturance that has been provided and his increased sense of security. Ms. Dillingham's current diagnosis of Teddy is Posttraumatic Stress Disorder.
Teddy, Joyce P., and Ruth P. underwent court ordered psychiatric evaluations conducted in July, 1998 by Dr. Richard B. Sadler. Dr. Sadler found Teddy to be a "likable, intelligent and pleasant child." Although Teddy exhibited mild anxiety and obsessiveness, Dr. Sadler determined that Teddy appeared to be developing well. He had age appropriate skills and interactions. CT Page 15424 Dr. Sadler concluded that "Teddy continues to have a degree of emotional distress, stress and evidence of continuing psychiatric symptoms that have resulted from the neglect and the abuse which he experienced while in the care of his mother and grandmother. Ongoing psychotherapy, counseling and support would be expected to be needed by Teddy, and for the support of his guardian, for years to come."
Dr. Sadler found Joyce P. to be of average intelligence. He determined that she demonstrated poorly organized thinking and she was unable to identify or respond to Teddy's emotional needs. In Dr. Sadler's opinion, she possessed a dramatically impaired ability to understand her child's developmental and emotional needs and these impairments have been unchanged over Teddy's lifetime. Joyce P. expressed no significant understanding of the nature of her own impairment and her efforts at psychotherapy, family counseling, parent education and pharmacological interventions have resulted in no significant change in her thinking, understanding or behavior.[2] Dr. Sadler concluded that Joyce P.'s presence was emotionally damaging to Teddy and detrimental to his well-being. He opined that Joyce P. will never be able to adequately care for Teddy. According to Dr. Sadler, she has never demonstrated any behavior or insight or functional improvement that would give any reason to hope that she will be able to develop adequate parenting skills within a time frame that would not be severely detrimental to Teddy's development.
Joyce P. presented the testimony of Susan Waldman, a mental health clinician at Waterbury Hospital, who performed an evaluation of her on September 25, 1997. In Ms. Waldman's opinion, Joyce P. does not suffer from any major mental illness and she does not require any intensive mental health treatment. Ms. Waldman was not able to rule out two possible mental disorders, anxiety disorder and personality disorder, and she recommended further evaluation of these two areas.
 I. ADJUDICATION
In a proceeding for termination of parental rights, DCF must prove a ground alleged in the petition, as of the date of the filing or last amendment, by clear and convincing evidence. In reTheresa S., 196 Conn. 18 (1985). See also General Statutes Section 17a-112© and Practice Book Section 34-3. Only one ground need be established for the petition to be granted. In reJuvenile Appeal (84-BC), 194 Conn. 252 (1985). CT Page 15425
Abandonment, one of the grounds asserted by the petitioner with respect to James P., is defined by General Statutes Section 45a-717(g)(2)(A) and Section 17a-112(c)(3)(A) as a parent's failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of [his or her] child. . . ." The statutory definition differs from the common law concept of abandonment wherein an intent to abandon totally and permanently must be proved. See, e.g., Litvaitis v. Litvaitis, 162 Conn. 540,547 (1972); Kantor v. Bloom, 90 Conn. 210, 213 (1916) and In reShannon S., 41 Conn. Sup. 145, 151 (1989).
With respect to defining abandonment, the Connecticut Supreme Court, in In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11,15 (1981), stated that the commonly understood obligations of parenthood entailed the following minimum attributes: "(1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." See alsoIn re Rayna M., 13 Conn. App. 23, 36-37 (1987).
In the case of In re Michael M., 29 Conn. App. 112, 122
(1992), the Appellate Court sustained the trial court's finding of abandonment where the mother maintained only irregular and sporadic contact with her children, made no effort to contact them for a period of five months, did not appear for scheduled visitation or explain her absence, rarely called the children and did not send cards, letters or gifts. "Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Inre Migdalia M., 6 Conn. App. 194, 209 (1986).
"The statutory standard is not whether the parents have shown some interest in their children. Common sense dictates that a parent's obligations toward his or her child go further than a minimal interest." In re Rayna M., supra, 13 Conn. App. 36-37.
The court finds by clear and convincing evidence existing on the date of the filing of the petition that Teddy P. had been abandoned by James P. in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. The court further finds that this CT Page 15426 ground for termination has existed for more than one year. Since Teddy's placement with DCF almost three years ago, his father has not visited him at all. James P. has also made no effort to contact Teddy, either directly or through DCF. He has not provided any financial support to Teddy and he has also not sent any cards, letters or gifts to him. James P. has failed to express love or affection for Teddy in any manner or at any time. For whatever reason, Teddy is not a significant part of his father's life and his father has for all intents and purposes abandoned him.
As to Joyce P., Teddy's mother, DCF claims that she has failed to achieve the appropriate degree of personal rehabilitation to warrant maintenance of her parental rights. Section 17a-112(c)(3)(B) of the General Statutes provides that the court may grant a petition seeking the termination of parental rights if the court finds by clear and convincing evidence that "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child."
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. In conducting this inquiry, the trial court must analyze the respondent's rehabilitative status as it relates to the needs of the particular child. The trial court must also determine whether the prospects of rehabilitation can be realized within a reasonable time given the age and needs of the child. Thus, the trial court's inquiry requires the determination of both the present and past status of the child, and obtaining a historical perspective of the respondent's child caring and parenting abilities." (Internal quotation marks and citations omitted.) In Re Tabitha P., 39 Conn. App. 353, 360
(1995). See also In Re Christina V., 39 Conn. App. 214 (1995).
The evidence presented in this case is clear and convincing that Joyce P. has not been able to meet the needs of Teddy P. in the past and that she will not be able to meet his needs at any time in the future. While in her care, Teddy was seriously emotionally neglected with significant detrimental results. Teddy's development was significantly delayed. He was unable to CT Page 15427 appropriately communicate and relate socially. He was anxious and distressed and he engaged in ritualistic and obsessive compulsive behaviors.
Fortunately, Teddy's removal from his mother's care and the cessation of all visitation together with intensive therapy have dramatically improved his development. He is now basically a happy, healthy, normal eight year old child. None of the substantial progress made by Teddy is attributable to anything that Joyce P. has done. Rather, she has shown repeatedly that she is unable to make the changes necessary to effectively parent Teddy and meet his emotional needs.
Great efforts were made by Ms. Dillingham, Teddy's therapist, to assist Joyce P. in recognizing Teddy's needs and her own failings. Unfortunately, Joyce P. has shown that she is incapable of gaining any understanding of Teddy's emotional and developmental needs and incapable of changing her behavior to meet those needs. The evidence in this case amply demonstrates that there is no reason to believe that Joyce P. will at any point in the future be able to rehabilitate herself and attain appropriate parenting skills.
In light of the above, the court finds that it has been established by clear and convincing evidence that Joyce P. has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Teddy, she could assume a responsible position in the life of the child.
 II. DISPOSITION
Having found by clear and convincing evidence that the statutory grounds alleged by the petitioner for the termination of parental rights of James P. and Joyce P. with respect to Teddy P. have been proven, the court must determine pursuant to Section 17a-112(c), as amended, if a termination of parental rights is in the best interest of the child. In so doing, the court must consider and make findings on each of the following seven enumerated criteria of General Statutes Section 17a-112(e). All facts, up to and including the date of trial, must be considered in the dispositional phase.
1. Services Offered: The court finds that DCF offered timely and appropriate reunification services to both respondents to the CT Page 15428 extent possible under the circumstances. The services offered to Joyce P. were extensive. DCF arranged psychological evaluation and treatment services, family therapy, parenting education, and visitation with transportation when it was appropriate to do so.
DCF was unable to provide any reunification services to James P. because he had abandoned Teddy and had no intention of seeking reunification with Teddy.
2. Reasonable Efforts to Reunite: The court finds by clear and convincing evidence that DCF made reasonable efforts to reunite the child and the parents.[3] DCF initially encouraged and sought to facilitate visitation by mother. Visitation continued until it was terminated by the court based on the determination that contact with mother was having a detrimental impact the child. DCF also made reasonable efforts to reunite Teddy with Joyce P. by making available services which addressed the underlying psychological issues. DCF provided extensive psychological treatment and family therapy to Teddy and Joyce P. and parenting classes to mother.
Father made no effort to visit or contact Teddy. Unfortunately, it is impossible to reunify a child with a parent who will not even visit.
3. Court Orders: Court ordered expectations were established in this case on May 14, 1996. The expectations included requirements that Joyce P. keep appointments set by or with DCF, keep whereabouts known to DCF and her attorney, participate in individual, family and parenting counseling, follow the recommendations made by the counseling, sign releases as requested, and maintain adequate housing and income. Joyce P. complied with each of these obligations except one. She was unable to follow the recommendations of the service providers. Although she attended the counseling programs such as parenting education and family therapy when they were offered, she was completely unable to benefit from these services. She achieved no insight into her own behavior or Teddy's emotional and developmental needs. She was incapable of changing her behavior to meet her child's needs. She attended the counseling, the classes and the therapy but gained nothing from them. The situation demanded more than mere attendance. Fundamental changes in mother's understanding and behavior were required.
4. Significant Emotional Ties: Teddy presently has strong CT Page 15429 emotional ties to his foster family. His foster mother and foster father are his psychological parents. Teddy has no emotional ties to James P. As found by Dr. Sadler, Joyce P. does not currently have a parent-child relationship with Teddy and never had much of a relationship at all with her son. Teddy presently does not have emotional ties to his mother. He does not look to her for care or for understanding or for emotional support.
5. Age of Child: Teddy is eight years old.
6. Parents' Efforts to Conform Their Conduct to the Best Interests of the Child: Joyce P.'s central failing has been her complete inability to adjust her conduct in order to make it in Teddy's best interest to return home in the foreseeable future. The detrimental impact of her visits with Teddy resulted in visits being terminated. Her lack of insight and her inability to change her behavior have prolonged Teddy's stay in foster care.
James P. has made no effort to conform his conduct to the best interests of Teddy. He has failed to visit or contact Teddy or to maintain contact with DCF. He has not shown any degree of interest in Teddy's well-being.
7. Impediments to Parent/Child Relationship: There is no credible evidence before the court that mother or father have been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent or by anyone else. While the economic circumstances of mother appear to be limited, there is no evidence in the record to support the conclusion that her limited means have interfered in any way with her relationship with her child.
Respondent Ruth P., Teddy's maternal grandmother, has requested that custody of Teddy be transferred to her. The court finds, based upon the evidence presented, that it would not be in Teddy's best interest for the court to do so. Ruth P. lived with Teddy and his mother during the time that the court found Teddy to have been medically, emotionally and educationally neglected. She has consistently stated that she does not perceive any problems that need to be addressed by mother or by child. At trial, she testified that, if given custody of Teddy, she would take care of him as she did before.
Although she attended the family therapy with Ms. Dillingham, Ruth P. was not an active participant. Ms. Dillingham conducted CT Page 15430 an interactional evaluation of Teddy with Ruth P. Ms. Dillingham determined that, while she was Teddy's primary care giver and had a greater sense of warmth for him than did his mother, Ruth P. did not communicate well with Teddy and did not evidence an understanding of his needs.
Dr. Sadler conducted a psychiatric evaluation of Ruth P. as well as ones of Teddy and his mother. He determined that Ruth P. "demonstrates a massive failure of judgment and a massive failure of understanding regarding the emotional and physical needs of her grandson. These deficits in [Ruth P.] severely impaired Teddy's development, both physically and emotionally." Dr. Sadler found no essential difference between the interpersonal deficits of Joyce P. and Ruth P. Neither is able to understand the emotional needs of Teddy and neither has been able to identify or make any changes in their parenting deficits.
A transfer of Teddy's custody to his maternal grandmother would be tantamount to returning Teddy to his mother's care. Ruth P. has comparable parenting deficiencies and a similar inability to understand and respond to Teddy's emotional needs.
Respondent father has shown that he has no desire to care for Teddy. Respondent mother has repeatedly demonstrated that she lacks the ability to reassume the role of care giver for Teddy. Fortunately, Teddy is thriving, emotionally, educationally and medically, at his foster home. His foster mother has expressed an interest in adopting Teddy. Termination of parental rights would free Teddy for adoption and provide him with permanency and a sense of personal security. It is clearly and convincingly in his best interest that the respondents' parental rights be terminated.
 III. ORDERS
Based on the foregoing findings and upon consideration of all of the evidence in this case, the court concludes that it has been demonstrated by clear and convincing evidence that James P. has abandoned Teddy P. and that Joyce P. has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Teddy, she could assume a responsible position in the life of the child. The court finds that these grounds have existed over an extended period of time which is greater than one year. The court further finds that DCF has made reasonable CT Page 15431 efforts to reunify the child with his parents. The court concludes that it has been shown by clear and convincing evidence that it is in the best interest of Teddy P. to terminate the parental rights of James P. and Joyce P. and that it is not in his best interest to transfer his custody to Ruth P. Accordingly, it is ordered that the parental rights of James P. and Joyce P. are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. A permanency plan shall be submitted by DCF within ninety days of the date of this decision.
BY THE COURT
Judge Jon M. Alander
[2] In his written report to the court, Dr. Sadler stated that "competency is considered to be an issue" regarding Joyce P. and that she "would be strongly suspected of not being able to adequately assist in her own defense . . ." At trial, Dr. Sadler clarified these statements to mean that Joyce P. so completely lacked any insight into her own parenting deficiencies that she did not understand why Teddy was removed from her care by DCF. He found that she did understand the nature of the termination of parental rights proceeding.
Neither the attorney for Joyce P. nor her guardian ad litem requested a competency hearing. The court did not sua sponte order a competency hearing because the record before the court did not contain "specific factual allegations that, if true, would constitute substantial evidence of mental impairment" affecting mother's competency. In Re Alexander V., 223 Conn. 557,565 (1992). The evidence before the court indicated that Joyce P. did not suffer from a major mental illness and that she was capable of understanding the nature of the termination proceedings and assisting in the presentation of her case.
[3] The court has the obligation under General Statutes § 17-12(c)(1) to find by clear and convincing evidence that DCF has made reasonable efforts to reunify the child with the parent before granting a petition to terminate parental rights and the responsibility under General Statutes § 17-12(e)(2) to consider and make written findings regarding whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
CT Page 15432