[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum of decision on a petition filed by the Commissioner of the Department of Children and Families to terminate the parental rights of the respondent mother and the respondent father, with respect to their minor child, Alissa.
The Petition is Granted.
 MEMORANDUM OF DECISION
On September 5, 2000, the Department of Children and Families (D.C.F.) filed petitions to terminate the parental rights (T.P.R.) of Susan L. and William L. as to their daughter Alissa. Both the respondent mother and the respondent father were served with the petition in hand. Mr. and Mrs. L. were represented throughout the entire proceeding by. This court has jurisdiction in this matter and there is no pending action affecting custody of the child in any other court.
A guardian ad litem was appointed for Mrs. L. on March 12, 2001, (Conway, J.). On April 12, 2001, the guardian ad litem filed a motion requesting a competency evaluation of Mrs. L. In accordance with In ReCT Page 11833Alexander V. 223 Conn. 557 (1992), the court (Conway, J.) ordered on April 27, 2001, that Mrs. L. be evaluated in order to assess if she was competent. The competency evaluation was performed by Dr. Richard Sadler. On May 14, 2001, Dr. Sadler testified. He was qualified as an expert in forensic psychology. Following his testimony this Court found Mrs. L. incompetent and further found that she was not restorable to competency. The court will address the issue of Mrs. L. competency later in this opinion.
On April 4, 2001, the court (Conway, J.), in order to assist Mrs. L. to hear and follow what was being said in court, ordered that an electronic amplifying device and the C.A.R.T. system be in place at all future court hearings.
The statutory grounds initially alleged for both the respondent mother and the respondent father are the same: failure to rehabilitate, acts or omissions which denied the child care, and no ongoing parent-child relationship. D.C.F. was allowed to amend its petition on April 25, 2001, (Conway, J.) and now seeks to terminate the parental rights of both parents only on the ground of failure to rehabilitate. Both the respondent mother and the respondent father oppose the termination of their respective parental rights. The trial commenced on May 21, 2001, and resumed on May 22, 2001, and May 31, 2001. Evidence concluded, and closing argument were made, on June 8, 2001. Alissa was born on July 1991. She is a child with "special needs". She has intellectual limitations, limited comprehension and functions in the mentally deficient range. She has been diagnosed with Post Traumatic Stress Disorder (P.T.S.D.). Dr. Barbara Berkowitz examined Alissa when she was nine years old. At the time of her exam, according to Dr. Berkowitz, Alissa, intellectually and emotionally, functioned at the level of a four-and one-half (4 1/2) or five (5) year old child. Dr. Berkowitz that if Alissa receives tutoring and other special help she can maximize her potential. In addition, Alissa has petite mal seizures and takes Zarontin daily to address this seizure disorder.
On February 18, 1998, D.C.F. filed a neglect petition on behalf of Alissa. On that date D.C.F. also applied for an Order of Temporary Custody (O.T.C.) which was granted by the court (Jones, J.). The basis of that petition was (1) that Mrs. L. was regularly beaten by Mr. L., in the presence of Alissa, and (2) that Mrs. L. was hospitalized for intoxication and was often drunk and unable to care for herself or her daughter. On February 27, 1998, the O.T.C. was confirmed (Jones, J.). On December 15, 1998, a contested hearing was held to determine if Alissa was a neglected child. The court (Alander, J.) adjudicated Alissa neglected and placed her under protective supervision from December 16, 1998, to December 16, 1999. The court made the following findings: that Mrs. L. had a serious CT Page 11834 problem abusing alcohol and drugs, that Mr. L. assaulted Mrs. L. and that Mr. L. failed to recognize Alissa's intellectual deficiencies. The court further found that these conditions adversely affected Alissa's socialization and language ability. The court ordered Mrs. L. to obtain substance abuse treatment and domestic violence counseling. Mr. L. was ordered to complete domestic violence/anger management counseling, and to participate in counseling with respect to the physical abuse of Alissa. Both Mr. and Mrs. L. were ordered to co-operate with Intensive Family Preservation Services (I.F.P.) as well as to co-operate with Alissa's teachers and school psychologists and to comply with any recommendations that they made. On May 10, 1999, D.C.F. filed a motion to modify' the disposition order from protective supervision to commitment. Mr. and Mrs. L. opposed the modification. On May 24, 1999, preliminary specific steps were ordered for both Mr. L. (Exhibit E) and Mrs. L. (Exhibit F). Also, on May 24, 1999, D.C.F. applied for a second O.T.C. which was granted by the court (Alander, J.).The basis of this petition was that Alissa had been physically and/or sexually abused by Mr. L. Specifically, Alissa told investigators that Mr. L. would take off all her clothes, lay her on her back on her parents' bed and spread her legs apart. He would then put a tissue in his hand and touch her on the inside of her `pee-pee' (vagina). He did this often to make sure her pee-pee was clean. Alissa also told investigators that her mother was aware that her father checks her pee-pee. The hearing to confirm or vacate the O.T.C. was consolidated with the motion to modify disposition and evidence was presented over a number of days. On July 23, 1999, the court (Alander, J.) modified the original disposition from protective supervision to commitment. The court found, in part, that Mrs. L. had not addressed her substance abuse problem, that both parents were not co-operating with the Alissa's school's plans to address various educational issues, and that Mr. L. attendance at therapy sessions for domestic violence was not helping him address this problem. In addition, the court also found that Mr. L. had physically assaulted Alissa. The commitment was effective from July 23, 1999, to July 23, 2000. On July 21, 2000, at a hearing held at the Regional Child Protection Session, the commitment was extended to July 23, 2001. On May 14, 2001, this court extended the commitment to July 23, 2002.
In December of 1998, Mr. L. began treatment at the men's domestic violence group run by the Hospital of St. Raphael (H.S.R.) in New Haven. Mr. L. was still attending the group while evidence was being presented in the hearing to determine if the T.P.R. should be granted or denied. The group meets once a week for one-and one-half hours. On January 5, 1999, Mrs. L. participated in an evaluation at the domestic violence program at H.S.R. She denied ever being abused by her husband and was deemed inappropriate for group treatment. During March, April, and May, of 1999, the Bridges Program in Milford provided the L. with I.F.P. CT Page 11835 services. Bridges recommended that Mrs. L. receive domestic violence counseling. Both Mr. and Mrs. L. denied the need for Mrs. L. to receive domestic violence counseling. On June 21, 1999, and November 9, 1999, Mrs. L. told officers of the Woodbridge Police Department of acts of domestic violence committed against her by Mr. L. On January 10, 2000, Mrs. L. attended an Administrative Case Review (A.C.R.). She appeared there with two black eyes. At first she did not respond to a question from a social worker as to how she received these two black eyes and appeared nervous. She then told the workers that the black eyes were the result of a fall in her garage. On March 12, 2001, Mrs. L. accompanied by a D.C.F. worker, Natalie Rodriguez, and Attorney Thomas Esposito (who represents her in these proceedings) applied for, and was granted, an ex parte full restraining order (Exhibit H). The application stated, among other things, that Mrs. L. had been physically and sexually assaulted by Mr. L. She also stated Mr. L. threatened her, would not allow her to leave their home, would not allow her to use the phone, and called her derogatory names. On March 16, 2001, Mrs. L. appeared before Judge Domnarski asking that the restraining order be vacated and that Mr. L. be allowed to return home. Mrs. L. told the court that the statements that she made in seeking the order were true, but that she wanted the order vacated so that she could resolve these issues on her own.
In December of 1998, Mrs. L. was referred to H.S.R. for substance abuse treatment. H.S.R. determined that Mrs. L. was not appropriate for their program because she was on an addictive prescribed medication. However, they requested that she change this medication to a less addictive tranquilizer so that she could enter the program. She did not comply with this, and never entered the program. The Bridges program that Mrs. L. attended in 1999, recommended that Mrs. L. receive substance abuse treatment. Both Mr. and Mrs. L. denied the need for this treatment. On May 25, 1999, Mrs. L. was taken from a hearing before the court (Alander, J.) by ambulance to the hospital because she was intoxicated. On June 21, 1999, and June 30, 1999, Woodbridge police were dispatched to the L. home. On both those dates, Mrs. L. was found to be intoxicated and transported to the hospital. In August of 1999, Mrs. L. was referred to the Valley Mental Health (V.M.H.C.) for a substance abuse evaluation. She did not follow the recommendation for an in-patient program. Police were again dispatched to the L. home on November 9, 1999, and December 20, 1999. On both those occasions the responding officers found Mrs. L. intoxicated. On March 16, 2000, Mrs. L. was evaluated by the Substance Abuse Treatment Unit (S.A.T.U.). In-patient treatment was again recommended. Again, Mrs. Loomis failed to follow this recommendation. In July 2000, Mrs. L. started an out-patient group substance abuse program that met for one hour every week run by the Connecticut Counseling Center (C.C.C.) in Waterbury. Occasionally, urine screens for alcohol were taken by the program. These screens were always taken before a regularly CT Page 11836 scheduled group meeting. Mrs. L. concluded the program in February, 2001. On March 14, 2001, at 4:29 a.m., Officer Paul Pecoraro of the Woodbridge Police Department was dispatched to the L. residence on a 911 call. He found no emergency when he arrived but reported that Mrs. L. was visibly intoxicated. Officer Marissa McNeil testified that she and Officer Lawrence Rooney were dispatched to the Loomis residence at 8:15 a.m. on March 14, 2001 on a 911 call. Upon her arrival Mrs. L. was again intoxicated, to the point that she was taken to Yale-New Haven Hospital by ambulance. Blood drawn at 10:18 a.m. revealed a blood-alcohol level of 290 mg./dl. Blood drawn at 1:00 p.m. revealed a blood-alcohol level of 163 mg./dl.
Beginning in December of 1999, D.C.F. workers sought to have the L. sign releases so that they could access Alissa's records. The L. did not sign releases at first and the signing of releases by them was characterized as a continuing problem by a D.C.F. social worker assigned to the case, Lisa Anastasio. The Bridges program, while providing services to the L., noted that neither of them showed a willingness to work on the issues that were identified. In addition, neither of them followed through on recommendations that were made by service providers on Alissa's behalf, because either they had no understanding of their daughter's needs or they denied their daughter had certain needs.
The hearing on a petition to terminate parental rights is comprised of two parts. In the adjudicatory phase the trial court must determine whether the statutory ground(s) alleged by D.C.F. exists by clear and convincing evidence. In the adjudicatory phase the court is limited to considering events preceding the filing of the termination petition or the latest amendment. If a determination is made that one or more of the statutory grounds exists, the court then proceeds to the dispositional phase. In this phase the court determines whether the termination of parental rights is in the best interest of the child. In making this determination the trial court can consider all events occurring prior to the date(s) of the dispositional hearing including those occurring after the filing of the petition.
 ADJUDICATORY FINDINGS FAILURE TO REHABILITATE
Statutory grounds exist to terminate parental rights when "[the parent] of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child CT Page 11837 . . . "C.G.S. Section 17a-112 (j)(3)(B). In analyzing a respondent parent's rehabilitative status the court must look at the status as it relates to the particular child, and such rehabilitation must be foreseeable within a reasonable time. In Re: Roshawn R. 51 Conn. App. 44,54-55 (1998).
D.C.F. has made numerous referrals to various agencies in an attempt to address the multiple problems that the L. family presents. D.C.F. sought to provide help to Mrs. L. in the following areas: substance abuse evaluation and treatment, parenting classes, couples counseling, family counseling, domestic violence counseling, and individual counseling. The agencies who sought to provide these services include: the Addiction Prevention Treatment Foundation Central Treatment Unit (A.P.T.-C.T.U.) Catholic Family Services (C.F.S.), S.A.T.U., H.S.R., Bridges, New Haven Family Alliance (N.H.F.A.), V.M.H.C., Greater New Haven Counseling (G.N.H.C.), and the Yale-New Haven Hospital Child Study Center (Y.N.H.H.-C.S.C.). Mr. L. was also offered help to address the same issues as Mrs. L. The agencies who sought to provide these services include: A.P.T.-C.T.U., C.F.S., Connecticut Mental Health Center (C.M.H.C.), H.S.R., Bridges, The Non-Violence Alliance (NOVA), N.H.F.A., G.N.H.C. and Y.N.H.H.-C.S.C. Mr. L. continued to attend the domestic violence group run by the H.S.R. and Mrs. L. did participate in the substance abuse program at the C.C.C.
However, all that they have done is physically attend these programs. Judge Alander on December 15, 1998, told Mrs. L. she needed to address her drinking problem right away if she wanted to keep Alissa. She failed to co-operate with the programs to which she was referred. In fact she was intoxicated at a court hearing in May of 1999. Judge Alander on July 23, 1999 stated that Mrs. L. was in denial of her problem with alcohol abuse and did not recognize or refused to recognize her alcohol problem. Mrs. L. rather then following the S.A.T.U. recommendation of an in-patient substance abuse program, enrolled in a once a week out-patient program, that did not even take truly random urines. She told Ms. Anastasio that she did not need to go in-patient because she did not need to as she did not have a drinking problem. This `effort' by Mrs. L. to receive help for her alcohol abuse was like putting a band-aid on a bullet wound. While Mrs. L. may have attended this program she failed to benefit from the program. On March 14, 2001, 7 (seven) months after the T.P.R. petition had been filed, and with a trial date looming, Mrs. L. was found intoxicated by the Woodbridge Police. On one of these occasions she arrived at the hospital with an alcohol level of 290 mg./dl. Using standard conversion rates 290 mg./dl. translates to a blood alcohol of twenty-four hundredths of one per cent (0.24), well over the ten-hundred of one per cent (0.10) standard for operating a motor vehicle while under the influence of alcohol (C.G.S. Section 14-227a.) Dr. flerkowitz in her report dated CT Page 11838 October 23, 2000, (Exhibit M) states that Mrs. L. "grudgingly acknowledged that she was (emphasis added) a problem drinker" and that she was
(emphasis added) an alcoholic but was not one now."(Exhibit M at pg. 5). Dr. Berkowitz goes on to report that Mrs. L. was defensive and made excuses for her drinking. Most importantly Dr. Berkowitz concludes that Mrs. L. "did not appear to recognize the full extent of her difficulties." (Exhibit M at pgs. 5-6) [C]ourts are entitled to give great weight to professionals in parental termination cases." In re Christina V.,38 Conn. App. 214, at 221.
Judge Alander ordered Mrs. L. on December 15, 1999, to attend domestic violence counseling so that she could "understand what that [domestic violence] means and how to best assure that it doesn't continue to happen." (Exhibit D at pg. 8) Again, on July 23, 1999 Judge Alander pointed out to Mrs. L. that she failed to recognize that she was the victim of domestic violence. Yet, Mrs. L. did not obtain any counseling to address this issue and the abuse continued. Mrs. L. needed to obtain this counseling so that she could learn how to protect herself and Alissa from being abused by Mr. L. Instead, Mrs. L. failed to perceive this as a problem and did not co-operate with any of the services offered.
On December 15, 1998, Judge Alander told Mr. L. that he had a problem that he had to comes to grips with and ordered him to complete domestic violence counseling. On July 23, 1999, Judge Alander again noted that Mr. L. had a problem with domestic violence. Judge Arander, in ordering Mr. L. to continue to attend domestic violence counseling, observed that Mr. L. did not believe he had a problem. What Judge Alander noted more than two years ago is still true today. On November 9, 1999, Mrs. L. told the Woodbridge Police that she had been assaulted by Mr. L. On March, 14, 2001, some 7 (seven) months after the T.P.R. had been filed, and with a trial date imminent, Mrs. L. asked the court to issue a full restraining order. She stated in an affidavit dated, March 12, 2001, that she was assaulted by Mr. L. that very morning; that the day before Mr. L. had hit her in the mouth; that she is in continuous (emphasis added) threat of physical pain and injury at the hands of her husband who physically abuses her daily, and regularly grabs her by the neck and mouth and pushes her; that he does not allow her to (1) move freely within her own home, (2) use the phone freely, or (3) leave the house unless she is with him; that he controls the finances and only gives her $23.00 monthly; that he sexually abuses her. These allegations were confirmed by her in open court on March 16, 2001. Mrs. L. was placed under oath and the following colloquy took place between the Court (Domanrski, J.) and Mrs. L.
 The Court: When you signed (the affidavit), when you gave me these papers before you said some things that are quite serious, yes? CT Page 11839
Mrs. L. Yes.
 The Court: All right so why should I forget about what you said here?
 Mrs. L. . . . it wasn't that they were true, (emphasis added) it's just that I have to resolve them on my own. (Exhibit I at pg. 4)
Domestic violence acts are generally those of physical, sexual or verbal abuse. The word abuse is synonymous with the word mistreat. Mr. L. knowing of his wife's problem with alcohol and the devastating and debilitating effect it had on her, told officers from the Woodbridge Police Department on November 9, 1999, that he bought alcohol for Mrs. L. Providing alcohol to Mrs. L. which would only lead her to self-destructive behavior, is an act of domestic violence. In addition, Mr. L. exerted his influence over Mrs. L. so that she would not attend a domestic violence class. Mrs. L. acknowledged this when, in response to a question posed to her by D.C.F. social worker Lisa Anastasio as to why she had not gone to domestic violence classes, she responded, "Because Bill [L. wouldn't let her go." (T. 35) In her report dated October 23, 2000, Dr. Berkowitz noted that Mr. L.". . . grudgingly acknowledged a minimal amount of physicality in altercations with his wife . . . he dismissed this as completely over." (Exhibit M at pg. 11-12). On July 23, 1999, Judge Alander said to Mr. L. "until you realize it (that you have a domestic violence problem) you are not going to be able to do anything about it." (Exhibit G at pg. 11). Despite Mr. L. lengthy tenure at the domestic violence program run by H.S.R., Mr. L. has failed to acknowledge and/or address his domestic violence issue.
One of the specific steps ordered by Judge Alander on July 23, 1999, was that Mr. L. receive individual treatment to address the issue of his physical abuse of Alissa. Despite referrals for individual counseling, Mr. L. has undertaken no steps to address this problem.
D.C.F. has provided a plethora of programs, services, and referrals to address the problems of Mr. and Mrs. L. Respective counsel for Mr. and Mrs. L. argue that D.C.F. could have done more to help them. "The word reasonable is the linchpin on which the department's [D.C.F.] efforts in a particular set of circumstances are to be adjudged using the clear and convincing standard of proof . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) In Re Amanda A., 58 Conn. App. 451, 455. (2000).
It is the court's finding by clear and convincing evidence that given CT Page 11840 Alissa's needs, Mr. L. cannot, in a reasonable amount of time, become capable of parenting Alissa. Further, it is the court's finding by clear and convincing evidence that given Alissa's needs, Mrs. L. cannot in a reasonable amount of time, become capable of parenting Alissa.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether D.C.F. has proven by clear and convincing evidence that "termination is in the best interest of the child.' It is in the best interest of Alissa to have the parental rights of both the respondent mother and the respondent father terminated.
In accordance with C.G.S. Section 17a-112 (k) the court makes the following findings:
(1) The court must look at the timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parents. D.C.F. made considerable efforts to help Mr. and Mrs. L. with their respective problems. They provided referrals to a multitude of agencies to address all of the L. issues. With the exception of Mr. L. involvement with the H.S.R. domestic violence program and Mrs. L. involvement with C.C.C. (both of which had minimal impact on the L. due to their inability to perceive and/or address their respective problems), Mr. and Mrs. L. failed to did not take advantage of these services.
(2) This court finds that D.C.F. made reasonable efforts to reunite the parents with the child pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended. For the reasons set forth previously, the court finds that D.C.F. offered appropriate services and sufficient time for the respondent parents to reunify with their child.
(3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order must also be addressed. On December 15, 1998, Judge Alander ordered both Mr. and Mrs. L. to obtain treatment for various problems that they have and to co-operate with Alissa's teachers and psychologist. Judge Alander did not merely read steps from a preprinted form, he went to great lengths to explain not only his reasoning in entering his orders but their importance. Preliminary specific steps were signed by Judge Alander on May 24, 1999, for both Mr. L. (Exhibit E) and Mrs. L. (Exhibit F). The court action sheet for July 23, 1999, indicates that these specific steps were signed/approved on July 23, 1999. In his remarks of July 23, 1999, Judge Alander again, in addition to reciting the specific steps, commented CT Page 11841 extensively on them and told the L. that he entered these steps "in the hope that each of you in the future will take these steps so that Alissa can be reunified with you" (Exhibit G at pg. 12) With the exception of Mr. L. involvement with the H.S.R. domestic violence program, Mrs. L. involvement with C.C.C. (both of which had minimal impact on the L. due to their inability to perceive and/or address their respective problems) and the singing of releases, Mr. and Mrs. L. failed to comply with the court orders and specific steps.
(4) The feelings and emotional ties of the child with respect to the child's parents, any guardian of the child, and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant ties must be addressed. After Judge Alander modified his earlier disposition from protective supervision to commitment, visitation was established between Alissa and her parents. The visitations started out as supervised therapeutic visitation at the Y.N.H.H.C.S.C. The visitation was then changed to only supervised visitation. The visitation then was halted. Lisa Anastasio often transported Alissa to visits and supervised some of them. Beginning in August or September of 2000, Alissa told Ms. Anastasio that she did not want to have any more visits. She mentioned after every visit that she did not want any more visits. The reasons that she wanted the visits to stop was that the visits were bringing back memories that were making her unhappy. Alissa told Lisa Anastasio, after the visit of October 18, 2000, that the visits brought back memories of (1) her seeing inappropriate sexual videos where naked people were "having sex — the man putting his `pee-pee' in the woman" (T at pg. 23), (2) her father opening her legs and wiping her for a long time, (3) taking showers with her mom and dad, and (4) mom and dad fighting. Ms. Anastasio noted during the course of a visit Alissa would become withdrawn, not have any expression and appear to be uncomfortable. When Ms. Anastasio would announce that a visit was over, Alissa's affect would change completely — her face showed spirit and color and she was happy to be leaving. When she returned to her foster family she would either sit in her room, withdrawn, or sit on the couch and not talk to anyone. When the visits were stopped, Alissa was asked many times if she wanted to resume them. She always said she did not. Ms. Anastasio observed that after the visits stopped Alissa became more positive. She was more talkative, more affectionate and was a happier child. These observations are confirmed by the observations of Jennifer M. Alissa's foster mom. Mrs. M. reported to Dr. Berkowitz, that during a period of time when no visits were occurring Alissa seemed like "a different kid, much happier and brighter" (Exhibit M — pg. 22). Dr. Berkowitz noted that prior to the interactional session of October 12, 2000, Alissa told her that she did riot want to visit with her parents. Alissa was anxious and needed reassuring prior to seeing her parents. In fact, she was shaking and clung onto CT Page 11842 Dr.Berkowitz's hands as they walked down the hall — Dr. Berkowitz, a person she had met for the first time a few minutes earlier. She would not allow her father to hug her and kept both her parents at arm's length. When the visit was over Alissa was not hesitant about leaving Mr. and Mrs. L. and was "happy and eager to rejoin her foster parents" (Exhibit M — pg. 25). Mrs. M. reported to Dr. Berkowitz that after this session of October 12, 2000, Alissa closed down, not wanting to talk to people at home. Also, Mrs. M. reported that after the session Alissa's behavior at school became more volatile and disruptive. Alissa's feelings toward her parents are feelings of fear and apprehension based on what transpired while Alissa lived with them. She has repeatedly stated that she does not want to visit with them and the effects of the visits is disastrous. She has no ties with them.
Alissa has been placed with her foster family, Jennifer and William M. and their three daughters since May of 1999. The M and Alissa are emotionally connected to the extent that she would not feel safe visiting her parents at their home unless Mrs. M. was with her. She would like the M to be her mommy and daddy. Alissa has positive feelings towards the M and has strong ties to them.
(5) Alissa has recently turned 10 (ten).
(6) The efforts the parent has made to adjust her or his circumstances, conduct or conditions to make it in the best interest of the child to return to such home in the foreseeable future, including but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications, or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child. The L. attended both the therapeutic and non-therapeutic visits regularly, on occasions bringing gifts. However, Alissa did not want these visits to occur and the aftereffects on Alissa were deleterious.
(7) The final consideration is the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any person or by the economic circumstances of the parent. This court is unaware of any unreasonable act or conduct by anyone or any agency or of any economic circumstance that prevented the respondents from having a meaningful relationship with Alissa.
MRS. L. MENTAL STATUS
Prior to the commencement of trial, in accordance with In Re AlexandreCT Page 11843V. 223 Conn. 557 (1992), a competency evaluation was ordered for Mrs. L. She was examined by Dr. Richard Sadler. Following his testimony this court found that Mrs. L. was not competent and that she was not restorable to competency. In Re Alexander V. defines an individual as incompetent as one who is unable to understand the nature of the termination proceeding and unable to assist in the presentation of his or her own case. The fact that Mrs. L. has been found incompetent does not mean that she could not rehabilitate herself. Mrs. L. is capable of rehabilitating herself. Mrs. L. was, and is, able to do many things. She is capable of seeking assistance to address her problems with domestic violence and substance abuse. She is further capable of successfully overcoming those problems. She has chosen to do neither.
CONCLUSION
Alissa is a child need in need of permanency and stability. The court agrees with Dr. Berkowitz that reunification with the L. is not in Alissa's best interest and not to terminate the parental rights of Mr. and Mrs. L. would condemn Alissa to a life in limbo, ". . . the termination if parental rights is part of the adoption process; it is clear that adoption cannot proceed unless the parents' rights are terminated in the first instance. The converse is not true. The parents' rights can be terminated without an ensuing adoption." In Re Theresa S.196 Conn. 18, 30 (1985).
Alissa is a fragile child. She needs a home that is safe and parents who provide for her basic needs. The M provide such a home. She is well fed and well clothed. She has learned, with the help of the M to put her shoes on the correct feet, take a shower by herself and ride a bicycle. She could not do these things when she first arrived at the Mitchell home, despite being almost eight (8) years old In contrast, the L. home is one that is regularly visited by the police who respond to Mrs L. intoxication. A home to which police officers go to accompany Mrs. L. to make sure Mr. L. has complied with a restraining order. A home where litter boxes overflow spilling urine and feces on the floor with a resulting odor that almost knocks police officers over. A home where clocks are not set and the electricity does not work because faulty circuit breakers are not replaced.
Alissa has intellectual limitations. The M make sure that Alissa goes to school every day so that she can get the specialized education that she needs. In contrast, the L. think that Alissa educational needs would be better addressed if she was tutored at home by Mrs. L.
Alissa also has emotional and psychological issues due to the various types of neglect attributable to her parents. According to Dr. CT Page 11844 Berkowitz, if Alissa is returned to the L. a Dissociative Disorder could result.
Alissa suffers from petit mal seizures. The M have managed the seizures by making sure Alissa takes her medication; the L. refused to acknowledge that Alissa suffered petit mal seizures.
The M are committed to taking care of Alissa for a long term and possibly adopting Alissa. Mrs. L. placed wanting to get Alissa home as third in her list of goals for the future, between doing a lot horseback riding (number 2) and getting into art (number 4). First on the list was getting her driver's license back. Mr. L. told Dr. Berkowitz that his plans for the future were to move to a farm and raise thoroughbred horses. "He then added (emphasis added) that these plans included his daughter being home with them" (Exhibit M — pg. 14).
Based on the foregoing findings, the court determines that it is in the best interest of Alissa that a termination of parental rights be entered with respect to both the respondent mother Susan L. and the respondent father William L. Accordingly, the court hereby grants the termination petitions. The court further orders that the Commissioner of D.C.F. is appointed statutory parent for Alissa. The Commissioner shall file with this court no later that thirty days following the judgement a written report of efforts to effect a permanent placement for Alissa and file further reports as are required by state and federal law.
Gerard Esposito Judge of the Superior Court